[Crim. No. 8656. Third Dist. Sept. 30, 1976.]

THE PEOPLE, Plaintiff and Appellant, v.
BETTY MARIE CRAMBLIT et al., Defendants and Respondents.

476

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and William G. Prahl, Deputy Attorneys General, for Plaintiff and Appellant.

Gerald D. Wolcott for Defendants and Respondents.

## OPINION

**FRIEDMAN, Acting P. J.**—An information charged defendant Cramblit with two violations and defendant Rawls with one violation of Penal Code section 496a. Essentially, the statute imposes criminal penalties on secondhand and junk dealers who fail to use due diligence to ascertain the authority of persons seeking to sell metal parts or wire of a sort ordinarily used by public utilities.[1] The trial court granted a defense motion to set aside the information. The People appeal.

Defendant Cramblit operated and defendant Rawls was employed at a used metals establishment. According to the prosecution evidence at the preliminary examination, an undercover police officer sold defendants 12 brass water meters without inquiry as to his identity or as to ownership of the meters. The officer was asked only to sign a receipt; he did so, using a fictitious name. On another day, defendant Cramblit bought 368 pounds of copper "telephone wire" from an undercover officer, who identified

---

[1]The full text of Penal Code section 496a is as follows:

"(a) Every person who, being a dealer in or collector of junk, metals or secondhand materials, or the agent, employee, or representative of such dealer or collector, buys or receives any wire, cable, copper, lead, solder, mercury, iron or brass which he knows or reasonably should know is ordinarily used by or ordinarily belongs to a railroad or other transportation, telephone, telegraph, gas, water or electric light company or county, city, city and county or other political subdivision of this state engaged in furnishing public utility service without using due diligence to ascertain that the person selling or delivering the same has a legal right to do so, is guilty of criminally receiving such property, and is punishable, by imprisonment in a state prison for not more than five years, or in a county jail for not more than one year, or by a fine of not more than two hundred fifty dollars ($250), or by both such fine and imprisonment.

"(b) Any person buying or receiving material pursuant to subdivision (a) shall obtain evidence of his identity from the seller including, but not limited to, such person's full name, signature, address, driver's license number, vehicle license number, and the license number of the vehicle delivering the material.

"The record of the transaction shall include an appropriate description of the material purchased and such record shall be maintained pursuant to Section 21607 of the Business and Professions Code."

himself by presenting an expired temporary driver's license issued to a person whose physical description diverged enormously from the officer's.

Defendants contended in the trial court, as they do on appeal, that section 496a should be construed to require proof that the property was actually stolen; that the statute would be void for vagueness if construed to apply to goods which had not been stolen. Defendants rely on *People v. Tatum* (1962) 209 Cal.App.2d 179, 183-184 [25 Cal.Rptr. 832], and *People v. Rosenthal* (1910) 197 N.Y. 394 [90 N.E. 991]. These arguments provided the basis for the trial court's conclusion that defendants' commitment by the magistrate had been illegal. (Pen. Code, § 995.)

The *Tatum* case lends no support to defendants' interpretation of section 496a. There the court remarked arguendo that Penal Code section 496 and the following statutes were designed to discourage fencing in stolen goods. So they are. That general objective does not support defendants' proposed interpretation. The *Tatum* court, in any event, had no concern with section 496a and was not attempting to construe it.

In *Rosenthal*, the New York statute defining the offense of receiving stolen property had been amended in 1903 by addition of a clause requiring "diligent inquiry" by secondhand dealers buying metal parts used by public utilities. Prior to the 1903 amendment, the New York court noted, the crime of receiving stolen property had required actual or constructive knowledge of theft. Relying on the statute's history preceding the amendment, the court held that the entire statute, including the amendment, applied only to property which had been actually stolen.

A statute must be construed in the light of the legislative purpose and design; both the policy expressed in its terms and the object implicit in its background should be recognized. (*People v. Navarro* (1972) 7 Cal.3d 248, 273 [102 Cal.Rptr. 137, 497 P.2d 481].) The history and language of Penal Code section 496a impel an interpretation unlike that given the New York statute. The common law crime of receiving stolen property had been adopted as section 496 of California's 1872 Penal Code. The receiving offense (as distinguished from an attempt to commit the offense) required proof that the property had been stolen and that the receiver knew it. (*People v. Vann* (1974) 12 Cal.3d 220, 224 [115 Cal.Rptr. 352, 524 P.2d 824]; see also, *People v. Moss* (1976) 55

Cal.App.3d 179 [127 Cal.Rptr. 454]; 51 State Bar J. 493 (1976).) Section 496a was enacted as a new, separate provision by Statutes of 1919, chapter 638. It bore approximately the same form as subdivision (a) of the present statute. (Fn. 1, *ante.*) As adopted, it had all the appearance of a regulatory provision quite distinct from the receiving-stolen-goods statute. Indeed, an appraisal of the conditions to which it applied justifies the inference that it had a distinct purpose and a distinct application.

Public utility lines and fittings are scattered throughout the countryside, often in isolated locations, difficult to guard and peculiarly vulnerable to thievery. Utility operators often sell their surplus metal. Thus, both thieves and honest peddlers offer these goods to junk and secondhand dealers. Willful ignorance of the metal's stolen character would immunize the buyer from prosecution as a receiver of stolen goods. Thus section 496, standing alone, lacked sufficient force to deter fencing in stolen utility fittings.

As enacted in 1919, section 496a had the obvious objective of deterring thieves from converting stolen utility fittings into cash. It could fulfill this objective only by demands made of all who offered this kind of merchandise for sale. Thieves would be discouraged only if the dealer used "due diligence" to identify all who brought that kind of property to his door, honest and dishonest alike. A statute permitting selective "due diligence" would be relatively toothless. The dealer who made no inquiry would be guilty of a crime if the seller eventually turned out to be a thief, innocent if events proved him honest. As enacted in 1919, section 496a was to be viewed as a regulatory statute distinct from the "receiving" law, requiring dealers in utility fittings to exercise due diligence toward all who offered these goods for sale.

Later statutory history supports this appraisal of legislative objective. Prevention of fencing by dealers in used merchandise was apparently a continuing problem. In 1935 the Legislature added a new section 496bb to the Penal Code. (Stats. 1935, ch. 434.) In its first subdivision, the new statute defined the crime of receiving stolen property in approximately the same terms as section 496; in its second and third subdivisions, the new statute imposed special burdens on any secondhand dealer "who buys or receives any property which has been stolen," creating a presumption of knowledge of the property's stolen character and placing on him the burden of showing that he made reasonable inquiry to ascertain that the seller had the legal right to sell it.

The next statutory development occurred in 1941, when sections 21600-21608 were added to the Business and Professions Code. (Stats. 1941, ch. 1078.) These provisions apply to dealers in junk, including many kinds of secondhand dealers. They require affected dealers to record the place and date of each purchase and the name, address, occupation and vehicle license number of each person from whom the material is purchased. (Bus. & Prof. Code, § 21606.) The record must be maintained for at least two years after the purchase. (*Id.,* § 21607.) Failure to maintain the record is a misdemeanor. (*Id.,* § 21608.)

■ These provisions of the Business and Professions Code form a regulatory demand for record keeping by affected dealers. Although obviously designed to curb theft and fencing, they do not depend upon theft, awareness of theft or suspicion of theft. Their coverage provisions, Business and Professions Code sections 21600-21601, readily demonstrate their application to secondhand dealers who purchase public utility wire and metal fittings.

Still later, in 1951, the Legislature repealed section 496 (the receiving-stolen-goods statute of 1872) and renumbered the 1935 statute as section 496. (Stats. 1951, ch. 97.) Thus the current version of section 496 originates in the 1935 statute rather than in the 1872 Penal Code. Finally, by Statutes of 1967, chapter 588, the Legislature added subdivision (b) to section 496a. (Fn. 1, *ante.*) The latter requires the dealer who buys public utility metals to obtain from the buyer identification information parallelling that .demanded by the Business and Professions Code and requires compliance with the two-year record maintenance demand of section 21607 of the latter code.

■ To encapsulate this statutory history, section 496a, the 1919 statute regulating dealers in public utility fittings, has coexisted since 1935 with the receiving-stolen-goods statute, now section 496. The former is not a prohibition against purchasing stolen property, for that is the aim of the latter. The former embodies no express requirement of theft or awareness of theft; the latter demands theft in fact and actual or presumptive knowledge of it. Gravamen of the section 496a violation is the dealer's failure to exercise "due diligence" before buying the property. Guilty knowledge, in the sense of awareness or suspicion of its stolen character, is not an element of criminal liability.

■ Defendants, nevertheless, charge the proceeding with two kinds of unconstitutionality. Relying on *Lambert* v. *California* (1975) 355 U.S. 225 [2 L.Ed.2d 228, 78 S.Ct. 240], they assert that their failure to inquire, an omission not blameworthy in itself, cannot be punished criminally unless they had actual knowledge of the criminal statute. The *Lambert* decision invalidated a municipal ordinance punishing a convicted felon for failure to register locally, without regard to his awareness of the ordinance. The majority opinion of Mr. Justice Douglas (355 U.S. at p. 229 [2 L.Ed.2d at pp. 231-232]) distinctly pointed out that the ordinance was "entirely different" than the regulation of business activities. Section 496a is of the latter sort. It falls within the large class of penal regulations characterized by the doctrine *ignorantia legis non excusat.* (See 1 Witkin, Cal. Crimes (1963) § 148.)[2]

■ Finally, we sustain section 496a against defendants' charge that it is void for vagueness. " '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' " (*People* v. *Barksdale* (1972) 8 Cal.3d 320, 327 [105 Cal.Rptr. 1, 503 P.2d 257].)

■ Essence of the offense defined by section 496a is the dealer's failure to use "due diligence" to ascertain that the seller has a "legal right" to sell the property. " . . . in determining whether a penal statute is sufficiently explicit to inform those who are subject to it what is required of them the courts must endeavor, if possible, to view the statute from the standpoint of the reasonable man who might be subject to its terms." (*Pacific Coast Dairy* v. *Police Court* (1932) 214 Cal. 668, 676 [8 P.2d 140, 80 A.L.R. 1217].) Thus a statute requiring "diligent effort" to restore lost property is sufficiently explicit. (*Id.* at pp. 677-678.) Although a precise definition is difficult, the phrase "due diligence" is easily understood by persons of ordinary intelligence, particularly when aided by the specific directions in subdivision (b) of the statute. (See fn. 1, *ante.*) In lay terms, the phrase "legal right" is not at all obscure; it signifies that the person offering the property for its sale is its owner or

---

[2]Defendants do not claim unawareness of the inquiry and record-keeping demands imposed upon them by the "junk dealer" provisions of the Business and Professions Code.

has received the owner's authorization to sell. Section 496a meets the constitutional standard of clarity.

The trial court erred in setting aside the information. The order is reversed.

Regan, J., and Evans, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied November 24, 1976.