[Crim. No. 9216. Third Dist. July 31, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
BETTY MARIE CRAMBLIT et al., Defendants and Appellants.

438

COUNSEL

Gerald D. Wolcott for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and William George Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PARAS, J.—Defendants appeal from judgments (orders of probation) entered after a jury found them guilty of violating Penal Code section 496a. They were given misdemeanor sentences. Section 496a imposes criminal penalties on junk, metal, and secondhand material dealers or collectors who fail to use due diligence to ascertain the authority of persons seeking to sell metal parts or wire of a sort ordinarily used by public utilities.[1]

I

On October 27, 1975, Officer Jorge Gil-Blanco of the Sacramento County Sheriff's Department drove a truck to A-1 Metals (hereinafter A-1), 2600 Elkhorn Boulevard, Rio Linda, California, a business owned by defendant Betty Marie Cramblit's husband. He was working under-cover in street clothes. He had 14 water meters, which the Sacramento Sheriff's Department had obtained from a San Francisco police officer, in

---

[1]The full text of Penal Code section 496a is as follows:

"(a) Every person who, being a dealer in or collector of junk, metals or secondhand materials, or the agent, employee, or representative of such dealer or collector, buys or receives any wire, cable, copper, lead, solder, mercury, iron or brass which he knows or reasonably should know is ordinarily used by or ordinarily belongs to a railroad or other transportation, telephone, telegraph, gas, water or electric light company or county, city, city and county or other political subdivision of this state engaged in furnishing public utility service without using due diligence to ascertain that the person selling or delivering the same has a legal right to do so, is guilty of criminally receiving such property, and is punishable, by imprisonment in a state prison for not more than five years, or in a county jail for not more than one year, or by a fine of not more than two hundred fifty dollars ($250), or by both such fine and imprisonment.

"(b) Any person buying or receiving material pursuant to subdivision (a) shall obtain evidence of his identity from the seller including, but not limited to, such person's full name, signature, address, driver's license number, vehicle license number, and the license number of the vehicle delivering the material.

"The record of the transaction shall include an appropriate description of the material purchased and such record shall be maintained pursuant to Section 21607 of the Business and Professions Code."

two cardboard boxes in the back of the truck. The meters all had serial numbers and some had tags on them stating "San Francisco Water Department." Most were used, but one or two were entirely new. The cardboard boxes containing the meters were stamped "City and County of San Francisco."

Gil-Blanco spoke to defendant Niles Eugene Rawls, Jr., an employee of A-1, and stated that he had some metal for sale. Rawls took one of the meters from the truck and walked into the shop with it. He there asked defendant Cramblit how much they were paying for brass. Cramblit told Rawls they would pay 28 cents a pound for the meters. The meters were then taken to the scale where Rawls weighed them. Cramblit prepared a receipt, which noted the weight of the meters, the date, the price per pound, and the amount of money ($37.80) paid to Gil-Blanco.

Cramblit then told Gil-Blanco to "put your name down on the bottom of the receipt." Although there is a signature line on the receipt for the customer's signature, Cramblit did not have Gil-Blanco sign on that line. Gil-Blanco wrote the name "John James" and "1560 Helmit Drive, Citrus Heights" on the receipt, a carbon copy of which was given to him. On the original receipt, the type of vehicle and its license number were inserted into the appropriate spaces, but these spaces were not filled in on Gil-Blanco's carbon copy. Both the original and the copy were introduced into evidence.

Gil-Blanco was not asked by the defendants where he got the meters or if he had authorization to sell them. Neither was he asked for evidence of his identity.

On November 4, 1975, Detective James Monk and several other officers served a search warrant on defendants at A-1, and recovered several of the water meters. Cramblit and Rawls were both arrested following the search.

Larry McNeely, an analyst with the Department of Justice participated in the investigation and was present at A-1 when defendants were arrested. He testified that while there, he looked at the original receipt and noted that it did not then contain a description of Gil-Blanco's vehicle. After qualifying as an expert witness, McNeely testified that a reasonable scrap metal dealer knows or should know that water meters are items which are ordinarily used by or belong to a utility company. He also testified that scrap metal dealers generally are aware that they are

required to make diligent inquiry as to the ownership of such items when they are presented for sale. He further testified that among scrap metal dealers, there is a standard of care as to the degree of diligence to be exercised in purchasing public utility items. In response to a hypothetical question essentially setting forth the above facts, McNeely stated that in his expert opinion the defendants had not exercised due diligence in purchasing the meters. He added that he had observed field experiments in which scrap metal dealers in Sacramento County had refused to buy similar water meters.

Cramblit testified in her own behalf. She admitted buying the meters. She said the meter which Rawls brought into the office appeared to be used. She denied seeing any tag indicating that the meters came from San Francisco. Although admitting that she did not ask Gil-Blanco for any identification, she testified that she wrote the vehicle license number and type on the receipt on the day of the sale. Cramblit also said she did not ask Gil-Blanco any questions about his right to sell the meters because she did not think there was anything wrong with buying water meters. She testified that A-1 made various purchases of water meters over the year from the federal government, from the Arden and Rio Linda water companies, and at a public auction advertised in a newspaper.

Cramblit's brother, William R. Hite, testified as a defense witness. He said he had been a scrap metal dealer for at least four years; he had purchased scrap metal from military installations and at auction; he acknowledged that his experience as a scrap metal dealer had taught him that a water meter is a public utility item.

Rawls testified in his own behalf. He admitted purchase of the meters. He testified that he remembered that they were in two cardboard boxes in the back of Gil-Blanco's truck but that he did not notice whether the boxes had any printing on them. He admitted personally reaching into one of the boxes and taking one of the meters which he then carried into the A-1 office; he then asked Cramblit how much they were paying for brass; he did not recall that the meter had a tag on it; he later disassembled a majority of the water meters and removed the plastic cores from them; he denied ever seeing any tags on the meters; he did not consider water meters a public utility item.

Several witnesses testified for the defense that water meters are used in various industries such as canneries, refineries, breweries, redi-mix concrete plants, and paper mills. To show that private persons might

legally possess water meters, Rawls and two other witnesses testified that they had purchased new water meters from Sacramento plumbing supply houses.

## II

This is the second time this case has been before this court. The first occasion (*People* v. *Cramblit* (1976) 62 Cal.App.3d 475 [133 Cal.Rptr. 232] (hereinafter *Cramblit I*)) involved an appeal by the People after the trial court had set aside the information. Defendants made two contentions in that appeal: (1) "that section 496a should be construed to require proof that the property was actually stolen," and (2) "that the statute would be void for vagueness if construed to apply to goods which had not been stolen." (62 Cal.App.3d at p. 479.) We rejected the first contention on the ground that the legislative history demonstrated an intent to punish all failures to exercise due diligence, even where the property was not stolen, in order "to deter fencing in stolen utility fittings." (*Id.,* at p. 480.) We rejected the second on the ground that the statute is not vague, because the essential terms "due diligence" and "legal right" are understood by persons of ordinary intelligence, "particularly when aided by the specific directions in subdivision (b) of the statute." (*Id.,* at p. 482.)

### A.

■ Defendants' first major contention is that the trial court erroneously characterized section 496a as strict liability offense. We do not find any such characterization in the record. On the contrary, the court correctly determined, in obedience to *Cramblit I,* that a finding of ordinary civil negligence was required for conviction.

The trial court instructed the jury that ". . . the doing of the act is punishable as a crime. The intent with which the act is committed is immaterial to guilt." Immediately following, the court stated the elements of the 496a offense as follows:

"In order to find the defendants, or either of them, guilty you must find the existence of each element of the crime charged. It must be proven beyond a reasonable doubt that:

"1. The defendants were dealers in scrap metal or the agents or employees of such dealer;

"2. The defendants bought or received the water meters in question;

"3. Water meters are ordinarily and predominantly[2] used by or belong to water companies or municipalities providing public utility services;

"4. The defendants knew, or reasonably should have known, that water meters are ordinarily and predominantly used by water companies or municipalities providing public utilities;

"5. The defendants failed to exercise the due diligence that the reasonable scrap metal dealer would have exercised in determining that the person selling and delivering the water meters had a legal right to do so."

It is apparent from this listing of the elements of section 496a that the gist of the offense as presented to the jury is the failure to exercise *due diligence* before purchasing the water meters. These instructions thus correctly advised the jury of the required mental element for conviction. Defendants' argument that "criminal" negligence was required has been disposed of in *Cramblit I* (62 Cal.App.3d at pp. 480-481).

■ For the foregoing reason, we also reject defendants' contentions that they should have been allowed to have witnesses testify as to their good character and that they should have been permitted to argue that they acted under a "mistake of fact." As we discuss *infra,* the mere fact that they may have been mistaken as to whether the water meters were utility items is no defense; their mistake must have been a *reasonable* one.

## B.

Defendants' second major argument concerns procedure on remand in the event of a ruling in their favor on the first argument. We need not consider it.

## C.

■ As they did in *Cramblit I,* defendants again argue that section 496a is unconstitutionally vague, but on new grounds. They claim that the phrase "ordinarily used by or ordinarily belongs to [an entity] . . . engaged in furnishing public utility service," is vague.

[2]As we explain below, the word "predominantly" should not have been included here.

This phrase evoked considerable discussion at trial (out of the presence of the jury), with the court and counsel noting that such common nondistinctive metal items as paper clips, nails and automobiles are in fact "ordinarily used by or ordinarily belong to" utilities, and thus come within the literal terms of section 496a. Indeed the trial court was so troubled by the phrase that it added the word "predominantly" in instructing the jury, to make the phrase read "ordinarily and *predominantly* used by . . . ." (Italics added.)

While the statute is not a paragon of draftsmanship, we again reject the contention that it is unconstitutionally vague; we also conclude that the trial court need not have tried to repair it. The trial court and counsel failed sufficiently to consider that the phrase follows the words "which he knows or reasonably should know." In this context, a person of common intelligence need not "guess at its meaning." (*People* v. *Barksdale* (1972) 8 Cal.3d 320, 327 [105 Cal.Rptr. 1, 503 P.2d 257], see *Cramblit I, supra* at p. 482.) The entire phrase "he knows or reasonably should know is ordinarily used by or ordinarily belongs to" simply refers to items which *by their distinctive nature* give a reasonable dealer notice that they are so used or belong to a utility. So interpreted, section 496a requires "due diligence" whenever either the *kind* of property or identifying *markings* on property are such as should cause a reasonable dealer to suspect that it belongs to a utility. (Cf. § 496, subd. 3, which shifts the burden of proof to a secondhand dealer to show that he made "reasonable inquiry" to ascertain whether a seller had a legal right to sell, whenever the dealer bought *"under such circumstances* as should have caused him to make" such reasonable inquiry.) (Italics added.) There is no requirement that it be used *predominantly* by a utility; only that it be such as to give *notice* to a reasonable dealer of its ordinary character as a utility item.

Based upon the assumption that the trial court was correct in using the word "predominantly," defendants contend that no evidence of *predominant* use was presented. We need not reach the issue, as the court erred in adding the word in its instructions to the jury. Moreover, since the addition of the word had the effect of increasing the prosecution's burden of proof beyond that required by section 496a, the error was favorable to defendants, and hence not reversible. (*Walker* v. *Etcheverry* (1941) 42 Cal.App.2d 472, 476 [109 P.2d 385].)

## D.

█ Defendants argue that allowing the use of expert testimony on the issue of due diligence was prejudicial error. Specifically, they state that the question is "whether expert opinion is necessary[3] to 1) determine the standard of due diligence in the scrap metal business with regard to buying water meters, and 2) to determine whether these defendants exercised such due diligence." Defendants submit the answer is no in both cases.

On the contrary, stating the issue in this fashion compels an affirmative answer, for we are concerned, in defendants' own words, not with the standard among persons generally, but with the "standard of due diligence *in the scrap metal business.*" (Italics added.) This is a matter that is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; . . ." (Evid. Code, § 801.)

Defendants' reliance on the statement in *Cramblit I* that "the phrase 'due diligence' is easily understood by persons of ordinary intelligence," (62 Cal.App.3d at p. 482), is misplaced. The fact that the term "due diligence" is not vague does not mean that the standard for due diligence in the scrap metal trade is so capable of being determined by a lay jury that expert testimony is impermissible.

## E.

McNeely testified as an expert, and in response to a hypothetical question upon the evidence, stated that the defendants did not exercise due diligence in purchasing the water meters. Defendants contend that he was not qualified to give such testimony because he was not a scrap metal dealer and based his opinion on unreliable personal and telephone interviews. They claim prejudicial error.

█ Generally, unless a clear abuse of discretion is shown, the determination of the trial court regarding the qualifications of an expert will not be reversed on appeal. (*People* v. *Murray* (1967) 247 Cal.App.2d 730 [56 Cal.Rptr. 21].) Evidence Code section 720, subdivision (a), does not require an expert witness to be actually employed in the trade or profession to which his testimony relates: "(a) A person is qualified to

---

[3]We note that the word "necessary" is not appropriate. Expert testimony need not be *necessary* in order to be admissible; it need only be helpful.

testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." Cases abound in which the expert was not engaged in the profession to which his testimony related. (Of particular relevance, see cases collected in Witkin, Cal. Evidence (2d ed. 1966) § 412, subd. (5), p. 373, regarding testimony of police experts on subjects ranging from the proper loading of trucks to bookmaking practices.) Although the trial court's function is to determine the expert's qualifications, the degree of his knowledge and the weight his testimony will carry are matters for the trier of fact and do not affect the admissibility of his evidence. (*People v. Stuller* (1970) 10 Cal.App.3d 582 [89 Cal.Rptr. 158, 41 A.L.R.3d 712]; *People v. Utter* (1972) 24 Cal.App.3d 535, 552 [101 Cal.Rptr. 214].)

■ Preliminarily McNeely testified that he was employed as a criminal justice specialist by the California Department of Justice in the Burglary Fencing Unit. His duties involved developing techniques to assist law enforcement in suppressing fencing by scrap metal dealers and pawn brokers. He habitually read most theft reports in the state which relate to property which can be fenced through local scrap yards or metal dealers, and attended various symposia where such problems were discussed. He had written an annual assessment of the problem to the Legislature, as well as an article for the United States Department of Justice regarding the national problem of scrap metal theft enforcement. He belonged to four professional associations, and had had discussions with probably 200 scrap metal dealers in California as well as in other states.

He testified that in 1974 he telephoned every dealer in Sacramento and the surrounding region, including A-1 Metals, and "acted as though I were a suspicious individual, and attempted to sell water meters and telephone cable . . . ."[4]

He personally discussed the standard of due diligence with industry trade association representatives, as well as with scrap metal dealers[5] and their employees, law enforcement personnel, victims of utility equipment thefts, insurance companies, and convicted burglars. He said that a large number of water meters had been stolen in 1974, so he was particularly

[4]He attributed little validity to this segment of his study.

[5]During his particular survey regarding water meters, McNeely interviewed over 150 dealers in virtually every county in California.

concerned with water meters in his conversations with such individuals. In interviewing dealers he would identify himself as from the Department of Justice and ask "If you were going to purchase water meters, how would you go about it? What would you do? What would you look for? and why would you do it?" He said that at the time he conducted this survey, other counties attempted the undercover sale of water meters.

Before McNeely gave his opinion as to the standard of due diligence, the trial court ruled that in giving it he would be permitted to rely *only* upon "information obtained from his personal interviewing of scrap dealers, either in person or by way of telephone." After the opinion was given, the circumstances of the interviews were further elucidated in extensive cross and redirect examination. On cross-examination McNeely acknowledged that most of the dealers were very nervous when he questioned them, but he believed they were not simply telling him what he wanted to hear. On redirect-examination he testified that he had personally observed other attempts by undercover officers to sell water meters to other scrap metal dealers in Sacramento County, in which the dealers did not buy them. In these instances the dealers in fact acted in accordance with the manner indicated by them during interviews.[6] On recross-examination, he testified that he also had observed video-taped undercover attempts to sell water meters in counties other than Sacramento, and in all cases the dealers refused to buy them.

Defendants made timely objections to McNeely's testimony and to his qualifications as an expert. They contend that the telephone and personal interviews "do not form a reliable nor a sufficient basis for Mr. McNeely to be qualified as an expert," citing Evidence Code section 801, subdivision (b), and Witkin, California Evidence.

Evidence Code section 801, subdivision (b), states:

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, *that is of a type that reasonably may be relied upon by* an expert

---

[6]He was not asked the highly significant question as to whether the interviews occurred before or after the undercover offer.

in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Italics added.)

Witkin, California Evidence, *supra* at page 368 states: "When the expert's opinion is not based on matter perceived by or personally known to him, but depends on information furnished by others, the *opinion will be of little value unless the source is reliable.* The statutory requisite is a general one: The information must be 'of a type that reasonably may be relied upon' by the expert in forming his opinion upon the subject. (Ev. C., § 801(b).)" (Italics added.)

We find nothing in the foundational evidence to indicate that any error occurred in allowing McNeely to testify as an expert. He was no less qualified than the two defense experts who testified that the defendants met the standard of due diligence. The objections of defendants go to the weight of McNeely's opinions, not their admissibility.

The judgments are affirmed.

Puglia, P. J., and Reynoso, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 27, 1978.