[No. S009491. Crim. No. 24212. Dec. 3, 1990.]

In re STEVIE LAMAR FIELDS on Habeas Corpus.

**COUNSEL**

Michael G. Millman and Eric S. Multhaup, under appointments by the Supreme Court, for Petitioner.

John K. Van de Kamp, Attorney General, Gary R. Hahn, Thomas L. Willhite, Jr., Susanne C. Wylie and Carol Frederick-Jorstad, Deputy Attorneys General, for Respondent.

**OPINION**

**BROUSSARD, J.**—Defendant was convicted of the murder of Rosemary C., with the special circumstance of premeditated murder during the commission of robbery, and sentenced to death under the 1977 death penalty

law. He was also convicted of numerous crimes against other persons. On December 9, 1983, we affirmed the convictions and sentence. (*People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680].)

After the United States Supreme Court denied his petition for certiorari, defendant filed the present petition for habeas corpus with this court. We issued an order to show cause, and appointed the Honorable George Dell, retired judge of the Los Angeles Superior Court, as referee to take evidence and make findings of fact on the following question: "Was defendant's conviction or death sentence unconstitutionally obtained in that defendant was deprived of his right to effective assistance of counsel by counsel's failure to conduct an investigation adequate to permit the selection, preparation and presentation of evidence at the guilt and penalty trials?"[1]

Judge Dell held an evidentiary hearing and submitted his report to us on December 5, 1988. That report states two findings: "1. Petitioner has not established by a preponderance of the evidence that the procedures followed by trial counsel to investigate potential psychiatric defenses fell below minimum standards to be expected of reasonably diligent counsel in preparing an effective defense to a capital case." "2. Petitioner has established by a preponderance of the evidence that the procedures followed by trial counsel to investigate penalty phase evidence in mitigation fell below minimum standards." These determinations resolved mixed questions of fact and law, and are subject to independent review by this court. (*In re Cordero* (1988) 46 Cal.3d 161, 181 [249 Cal.Rptr. 342, 756 P.2d 1370].)

A finding that defendant was denied his right to effective assistance of counsel requires proof not only that counsel's performance was deficient, but also that defendant was prejudiced. The referee confined his findings to whether counsel's investigation fell below minimum standards, and made no finding whether defendant was prejudiced. He did, however, receive evidence on this point, and since that evidence is substantially undisputed, we are in a position to make an independent determination whether defendant was prejudiced.

We adopt the findings of the referee that counsel's investigation of mental defenses at the guilt and sanity phases did not fall below minimum standards. We do not decide whether his investigation of mitigating penalty evidence falls below the minimum expected of reasonably competent counsel, because defendant has not proved a reasonable probability (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698, 104 S.Ct.

---

[1] Defendant's petition for habeas corpus raised a number of other issues. On November 29, 1989, however, we modified the order to show cause to limit review to the issue that we had referred to the referee.

2052] (hereafter *Strickland*)) that a more complete penalty investigation and defense would have resulted in a different verdict. We therefore hold that defendant was not deprived of his constitutional right to the effective assistance of counsel at the penalty phase of his trial.

1. *Principles governing a claim of ineffective assistance of counsel raised by writ of habeas corpus.*

█ Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel. (E.g., *Strickland, supra,* 466 U.S. 668, 684-685 [80 L.Ed.2d 674, 691-692]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839]; *In re Cordero, supra,* 46 Cal.3d 161, 179-180; *People* v. *Pope* (1979) 23 Cal.3d 412, 422 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) This right " 'entitles the defendant not to some bare assistance but rather to *effective* assistance. Specifically, it entitles him to the "reasonably competent assistance of an attorney acting as his diligent conscientious advocate." ' " (*In re Cordero, supra,* 46 Cal.3d at p. 180; see *Strickland, supra,* 466 U.S. at p. 686 [80 L.Ed.2d at pp. 692-693]; *Ledesma, supra,* 43 Cal.3d at p. 215; *Pope, supra,* 23 Cal.3d at pp. 423-424; *United States* v. *De Coster* (D.C. Cir. 1973) 487 F.2d 1197, 1202 [159 App.D.C. 326].) The defendant can reasonably expect that before counsel undertakes to act, or not to act, counsel will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. (See, e.g., In re Hall (1981) 30 Cal.3d 408, 426 [179 Cal.Rptr. 223, 637 P.2d 690]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 166 [158 Cal.Rptr. 281, 599 P.2d 587]; see also *Strickland, supra,* 466 U.S. at pp. 690-691 [80 L.Ed.2d at pp. 695-696].)

█ " 'A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.' " (*Ledesma, supra,* 43 Cal.3d at p. 216, citing *Strickland, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693]; accord *People* v. *Fosselman* (1983) 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144].) "First, the defendant must show that counsel's performance was deficient." (*Strickland, supra,* at p. 687 [80 L.Ed.2d at p. 693]; accord *Pope, supra,* 23 Cal.3d at p. 425.) Specifically, he must establish that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland, supra,* at p. 688 [80 L.Ed.2d at pp. 693-694]; accord *Pope, supra,* at pp. 423-425.) In evaluating defendant's showing we accord great deference to the tactical decisions of trial counsel in order to avoid "second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel 'to defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial

. . . .' " (*In re Cordero, supra,* 46 Cal.3d at p. 180, quoting *Ledesma, supra,* at p. 216.) "However, 'deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. "[D]eference is not abdication" [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions.' " (*Ibid.*)

Second, a criminal defendant must also establish prejudice before he can obtain relief on an ineffective-assistance claim. (See *Strickland, supra,* 466 U.S. at pp. 691-692 [80 L.Ed.2d at pp. 695-697]; *Ledesma, supra,* 43 Cal.3d 171, 217; *In re Cordero, supra,* 46 Cal.3d 161, 180; *People* v. *Pope, supra,* 23 Cal.3d 412, 423-425.) "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . . [¶] The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* at pp. 693-694 [80 L.Ed.2d at pp. 697-698]; see *Ledesma, supra,* at p. 218; *In re Cordero, supra,* at p. 180.)

A reference hearing following issuance of an order to show cause is subject to the rules of evidence as codified in the Evidence Code. (See Evid. Code, § 300.) ▆ ▆ ▆ ▆ ▆ Under those rules, an out-of-court declaration is hearsay, and unless subject to some exception permitting it to be admitted, should be excluded upon timely and proper objection.[2] (See Evid. Code, § 1200.) A declaration so excluded is not part of the evidentiary record and cannot serve to support the findings of the referee or this court.[3] The same is true, of course, of declarations which are never offered into evidence, such as those in the present case. ▆ An expert witness, however, may base an opinion on reliable hearsay, including out-of-court declarations of other persons. (See Evid. Code, § 801; *People* v. *Cramblit* (1978) 84 Cal.App.3d 437, 448-449 [148 Cal.Rptr. 440]; 1 Witkin, Cal. Evidence (3d ed. 1986) The Opinion Rule, §§ 477, 481, 482, pp. 448, 452-453.)

---

[2] Declarations attached to the petition and traverse may be incorporated into the allegations, or simply serve to persuade the court of the bona fides of the allegations. If the return does not dispute the material factual allegations, the court may take them as true, and resolve the issues without a reference hearing. (See *In re Sixto* (1989) 48 Cal.3d 1247, 1252 [259 Cal.Rptr. 491, 774 P.2d 164]; *In re Love* (1974) 11 Cal.3d 179, 183-184 [113 Cal.Rptr. 89, 520 P.2d 713].)

[3] In *In re Hochberg* (1970) 2 Cal.3d 870 [87 Cal.Rptr. 681, 471 P.2d 1], the People submitted declarations in this court to contradict defendant's testimony at the reference hearing that she was denied her right to counsel. Our opinion asserted that we did not ignore those declarations, but were not bound by them, and went on to grant the writ. (Pp. 876-877.) We today reject any implication derived from *Hochberg* that a court has discretion to base its decision on disputed issues of fact in a habeas corpus proceeding upon inadmissible hearsay.

■ In a habeas corpus petition alleging incompetent investigation or presentation of evidence by trial counsel, a petitioner generally cannot expect to establish a case for relief solely by relying on testimony, expert or otherwise, describing what evidence might have been discovered and produced by competent counsel. Instead, he must generally produce that evidence so the credibility of the witnesses can be tested by cross-examination. (If the prosecution claims it could have refuted that testimony by rebuttal evidence, it may also have to produce the witnesses to prove its claim.) In effect, the petitioner must show us what the trial would have been like, had he been competently represented, so we can compare that with the trial that actually occurred and determine whether it is reasonably probable that the result would have been different.

2. *Was defendant deprived of the effective assistance of counsel by reason of counsel's failure to conduct a further investigation into mental defenses for the guilt and sanity phases of the trial?*

(A) *The investigation and presentation of mental defenses at the guilt and sanity phases of the trial.*

Carl Jones, an experienced criminal defense attorney, was appointed to represent defendant. Prior to trial the court, at defense counsel's request, appointed two psychiatrists, Drs. Franklin Drucker and Ronald Markman, to examine defendant. Because defendant refused to be interviewed by him, Dr. Drucker's report was inconclusive. Dr. Markman did interview defendant and submitted an opinion that defendant had an "antisocial personality," a recognized mental disorder previously referred to as sociopathy or psychopathy, and characterized by varied and persistent antisocial and criminal behavior. (See American Psychiatric Assn., Diagnostic and Statistical Manual (3d ed. 1980) (generally referred to as DSM III).) Dr. Markman said that he believed defendant was unable to conform his conduct to legal requirements, and thus insane under the American Law Institute (ALI) test then in use in California.[4] Counsel also obtained a psychiatric evaluation written by Dr. Tommy Bolger for the California Adult Authority at the time of defendant's 1977 conviction for manslaughter.[5]

---

[4] Under the ALI test, which we adopted in *People v. Drew* (1978) 22 Cal.3d 333, 345 [149 Cal.Rptr. 275, 583 P.2d 1318], a defendant is insane if "as a result of mental disease . . . he lacks substantial capacity either to appreciate the criminality . . . of his conduct or to conform his conduct to the requirements of law."

[5] The report offered a tentative diagnosis of explosive and antisocial personality, with latent schizophrenia. It noted that defendant was hostile, and totally lacked insight into the causes of his problems. It recommended intensive therapy because he had an above-average potential for violence, and was likely to become worse. Defense counsel furnished a copy of this report to the testifying doctors.

At the onset of trial, defense counsel added a plea of not guilty by reason of insanity. The court then appointed two additional psychiatrists to examine defendant, Drs. Donald Trockman and Saul Faerstein. Both agreed with Dr. Markman's diagnosis of "antisocial personality" but said that in their opinion defendant was nevertheless capable of conforming to legal requirements.

Defense counsel presented no mental defenses at the guilt trial. At the sanity trial, he called Dr. Markman, who testified to defendant's "antisocial personality," and gave his opinion that defendant was insane under the ALI test. The prosecutor called Dr. Markman's attention to subdivision 2 of the ALI test, which states that "the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."[6] Dr. Markman responded that under this definition defendant would not be insane. Drs. Trockman and Faerstein testified for the prosecutor; both said that defendant had an "antisocial personality" but was not insane.

The trial judge instructed the jury in accord with subdivision 2 of the ALI test that mental disease or defect does not include a condition manifested only by repeated antisocial conduct. The jury then returned a verdict finding defendant sane. On appeal, we approved the trial judge's instruction and upheld the finding. (See *People* v. *Fields, supra*, 35 Cal.3d 329, 368-372.) Defendant presented no evidence at the penalty phase.

(B) *Evidence at the habeas corpus hearing.*

At the habeas corpus hearing, defendant presented testimony by Dr. James Missett, a psychiatrist. Dr. Missett testified that the prior medical records, psychiatric evaluations, statements by significant individuals in defendant's life, and school records available at time of trial warranted further investigation. Dr. Missett stated that those materials provided a factual basis for a "monumentally different" image of defendant from that presented by the prosecution.

Dr. Missett considered the 1977 psychiatric diagnosis of possible schizophrenia to be particularly important because it recommended follow-up treatment but none was given. "It's one of the tragedies of Fields's life that he, at least two or three times, has follow-up psychological or psychiatric evaluations recommended and then never followed up on, and on at least one occasion where there are indications in the testing of a psychiatric

---

[6] When we adopted the ALI test in *People* v. *Drew, supra*, 22 Cal.3d 333, we left open the question whether to adopt subdivision 2. (*People* v. *Fields, supra*, 35 Cal.3d at p. 369.)

difficulty that would reasonably seem to point toward the necessity of a follow-up, again none is done."

Dr. Missett said that interviews of family members revealed the possibility that defendant had experienced a seizure at the age of nine, when he lost consciousness after being struck in the head by his father—who had been known to beat defendant in the past. Dr. Missett also believed defendant's blood loss and head trauma from a stabbing incident several years prior to the murder could have further aggravated a preexisting brain disorder. Establishing organic brain impairment would significantly mitigate the special circumstances aspect and explain why defendant acted in a manner that was described as cold, callous and calculating. Dr. Missett concluded that the totality of this information from a broad pool of sources could raise the possibility that defendant's mental functioning was impaired.

On cross-examination Dr. Missett agreed that according to DSM III, defendant demonstrated symptoms of antisocial personality disorder. In Dr. Missett's opinion, however, defendant's inability to conform to legal requirements was the result of parental approval and encouragement of criminal activity, coupled with a dependent personality which impelled him to adopt the parental values.

Attorney Gerald Chaleff also testified for defendant. Chaleff is a criminal law specialist who has investigated mental state defenses, tried more than 100 homicides, including capital cases, and lectured on psychiatric testimony. Based on his trial experience, research, and discussions with psychiatrists, lawyers and jurors in other capital cases, Chaleff asserted that a reasonable investigation of a mental state defense requires inquiry into a defendant's history of psychiatric evaluation, testing, treatment or hospitalization, as well as family or friends' observations of the defendant's personal history and the defendant's behavior and demeanor at the time of the crime. Chaleff said that Jones had failed to investigate adequately all of these areas. Chaleff concluded that a reasonably competent lawyer would not conduct defendant's trial in the same manner as defense counsel had done, even as a tactical choice, once he had acquired the new information that an adequate investigation of defendant's background would have revealed.

In rebuttal, the prosecution presented testimony from Dr. Saul Faerstein, who had also testified at trial. In Dr. Faerstein's opinion, a large portion of the general population has some degree of organic brain damage and is nonetheless capable of premeditation and deliberation. Even after reviewing the Markman, Missett and Trockman psychiatric reports, various psychological reports, Dr. Missett's trial testimony, a Buffalo social worker's

family assessment report and some of defendant's school records, Dr. Faerstein maintained that defendant had no significant organic brain disorder.

Dr. Faerstein did not believe defendant was under the influence of drugs during commission of the criminal acts. He reasoned that a drug-impaired individual would not have performed with the degree of sophistication that the crimes required. He agreed that losing five units of blood could cause brain damage that would affect the individual's ability to premeditate, deliberate, harbor malice and his intent to kill. However, he would expect such damage to produce, over a period of time, gross distortions in intellectual abilities, orientation, judgment and memory. Dr. Faerstein was personally aware of another individual who had lost five or more units of blood as a result of a beating and yet to date functions normally. He concluded by reiterating his prior diagnosis, that defendant suffered from an antisocial personality disorder and the sexual perversion of rape with sadistic features.

(C) *Evaluation of counsel's investigation.*

Relying on our decision in *People* v. *Williams* (1988) 44 Cal.3d 883 [245 Cal.Rptr. 336, 751 P.2d 395], the referee found that defendant did not establish that the procedures followed by trial counsel to investigate potential psychiatric defenses fell below minimum standards. In *Williams*, counsel entered an insanity plea before any psychiatric evaluations of the defendant. Two experts appointed by the court concluded that defendant was not insane and did not suffer from diminished capacity. On Williams's petition for writ of habeas corpus, a psychiatrist and a physician/pharmacologist set forth the existence of mental conditions available as defenses that had not been presented by the court-appointed psychiatrists.

Although Williams's habeas corpus counsel argued that trial counsel's failure to investigate potential psychiatric defenses constituted ineffective assistance of counsel, we held: "[F]ailure to seek the advice of 'independent' experts may not be characterized as constitutionally inadequate assistance . . . . We cannot accept the opinion of one expert that because another has reached a contrary conclusion with respect to a diagnosis the other is unqualified." (*Williams, supra,* 44 Cal.3d at p. 945.) "Competent representation does not demand that counsel seek repetitive examinations of the defendant until an expert is found who will offer a supportive opinion." (*Ibid.*)

In the instant case, counsel had two psychiatrists appointed to examine defendant before he pled not guilty by reason of insanity; two more were subsequently appointed to inquire into defendant's sanity. Counsel's investigator obtained defendant's prison psychiatric report prepared by Dr.

Bolger. In addition, the investigator's log shows that his investigation was focused on defendant's medical history and drug-use history with respect to a defense of diminished capacity. In Dr. Markman, counsel found a qualified expert witness who diagnosed his client as having an "antisocial personality" and, on the basis of that diagnosis, would testify that the defendant was insane. Dr. Markman did not suggest further tests or information was necessary to support that diagnosis or conclusion. Dr. Drucker offered no opinion, but the other experts agreed that defendant had an "antisocial personality"; none suggested a need for further investigation to look for alternative psychological explanations of defendant's behavior.

■ The essence of defendant's complaint, as we understand it, is that counsel was satisfied with this investigation of mental defenses, and did not pursue the matter further. In particular, counsel did not find an expert witness who, like Dr. Missett, would diagnose defendant as a "passive dependent" personality with possible brain damage, a diagnosis that might support a diminished capacity defense.

We agree, however, with the referee that counsel's investigation, while not as extensive as might have been done, was adequate to meet minimum standards. As we held in *Williams*, competent representation does not demand that counsel seek repetitive examinations. (*Williams, supra,* 44 Cal.3d at p. 946.) When three experts concur in a diagnosis, competent counsel might reasonably believe it pointless to search further in the hope of finding an expert who would offer a different diagnosis, or facts that would support such a view.

Defendant seeks to distinguish *Williams, supra,* 44 Cal.3d 883, on the ground that in *Williams* both experts rendered reports rejecting mental defenses, while in the present case one expert, Dr. Markman, rendered a favorable report. We fail to appreciate the distinction; we would think counsel who had found a suitable expert witness would be less inclined to look further than counsel who had not.

Counsel's actions, moreover, constituted a reasonable and consistent trial strategy. At the time of trial the California courts had not determined whether an "antisocial personality" would constitute a mental disease or defect for the purpose of an insanity defense. With three experts agreeing on that diagnosis, and one willing to testify on that basis that defendant was insane, counsel's best option might be to attempt to persuade the court to recognize this form of mental illness as grounds for an insanity verdict. If, on the other hand, counsel had found and presented an expert who testified that defendant had a passive-dependent personality, that diagnosis would have been disputed by two prosecution experts, who could cite the facts of

defendant's criminal record as support for their diagnosis of antisocial personality. Defendant now argues that counsel's defense was no defense at all, because the trial court and this court found it deficient as a matter of law. But this is the wisdom of hindsight; at the time it may well have offered defendant's best hope to avoid conviction.

3. *Was defendant deprived of the effective assistance of counsel by reason of counsel's failure to investigate and present mitigating evidence for the penalty phase of the trial?*

(A) *The investigation and presentation of mitigating evidence.*

Counsel called no witnesses at the penalty trial. Counsel discussed with defendant whether defendant should testify in his own behalf, and they agreed that he should not. Counsel also interviewed defendant's mother and some family members, but according to the referee those interviews related to issues of guilt, not mitigation. Counsel explained to the jury, and later at the habeas corpus hearing, that he decided not to call defendant's mother or sister as witnesses at the penalty trial because both had accepted money or property from defendant that they knew he had stolen.[7] The sister was both an accomplice to several of defendant's crimes and a prosecution witness. Other members of defendant's immediate family were also implicated in defendant's criminal activity.

Defense counsel, however, did not interview any of defendant's relatives who were not involved in his criminal activities. Despite the fact that counsel knew that defendant had lived in Buffalo, New York, for the first 15 years of his life, counsel did not conduct any investigation of defendant's childhood background nor did he direct his investigator to do so.

Seeking to make a virtue of the lack of mitigating witnesses, counsel argued to the jury that the absence of witnesses for defendant showed that defendant lacked a network of supportive family and friends to guide him and serve as role models. As counsel explained at the habeas corpus hearing, this theory was "not only the best argument I had available, it was the only argument I had available." He explained that he did not interview witnesses or seek out possible mitigating evidence because even if he found such evidence he would not use it since it would probably be inconsistent with his argument that defendant lacked family support or guidance.

---

[7] The mother actually appeared at the preliminary hearing wearing a blouse stolen from one of the victims.

(B) *Evidence at the habeas corpus hearing.*

Alice Christopher, defendant's maternal aunt, said she lived in defendant's home for six months when he was two years old. After moving out of the Fieldses' residence, Christopher remained in the same neighborhood as the Fields family. She maintained contact with all the Fields children until the Fieldses moved to California in 1973. She observed that defendant, "didn't have the family—the discipline, the chastising, the family involvement. He didn't have the like togetherness and the love for the whole entire family around each other." Instead, the Fieldses' family dynamic was frequently marked by verbal abuse, domestic violence, emotional neglect and intoxication.

From the ages of two to six, defendant had a severe body rash that caused him to bleed and cry in pain. Christopher described defendant as a sensitive child who loved and protected his mother, but who had a difficult childhood. She believed that defendant assumed father and provider roles even as a young child. At age nine, defendant began to steal in order to please his mother. Neither parent chastised or punished him for these wrongdoings, but rather accepted the proceeds of the thefts.

Defendant's thefts led to his placement in a boys' home. He received six months of outpatient psychotherapy after he was arrested for robbing a tavern. Christopher also recalled that defendant had been stabbed in the neck as a teenager, but she was unaware of any drug use by defendant.

Christopher described defendant as a very slow learner who demonstrated academic difficulties and an inability to perform simple tasks until he was seven or eight years old. He was subjected to constant ridicule for his delayed abilities. His parents separated periodically during his childhood. Christopher believes defendant's childhood had a bearing on his criminal conduct.

Defendant also presented the expert testimony of attorneys Gerald Chaleff and Leslie Abramson, who were experienced in the defense of capital cases. Chaleff expressed concern that trial counsel had made no attempt to interview credible family members who might have provided insight into defendant's childhood, or to obtain additional school or prison records. Abramson described the kind of investigation she believed necessary in the defense of this case and the mitigating factors which such an investigation might uncover. In their testimony, both attorneys referred to declarations that were attached to the habeas corpus petition and traverse and that described defendant's family background. The declarations themselves were not offered or received in evidence at the hearing.

(C) *Prejudicial effect of counsel's failure to investigate mitigating evidence.*

■ If counsel had offered mitigating character and background evidence at the penalty phase of the trial and the court had excluded that evidence, the judgment would be reversed unless the state proved beyond a reasonable doubt that the error did not contribute to the verdict. (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1032 [245 Cal.Rptr. 185, 750 P.2d 1342]; see *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 399 [95 L.Ed.2d 347, 353, 107 S.Ct. 1821].) When counsel fails to find or offer mitigating evidence, however, a different standard applies. As explained in *Strickland, supra,* 466 U.S. 668, in a habeas corpus proceeding alleging ineffective assistance of counsel, the defendant has the burden of showing a reasonable probability—a probability sufficient to undermine confidence in the outcome—that but for counsel's error the result would have been different.

*Strickland* began its analysis by rejecting both a presumption of prejudice standard (except in conflict of interest cases) and an "outcome-determinative standard." (466 U.S. p. 693 [80 L.Ed.2d at p. 697].) "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." (*Ibid.*) Instead, "the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, *United States* v. *Agurs* [(1976)] 427 U.S. [97] at 104, 112-113, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness, *United States* v. *Valenzuela-Bernal* [(1982) 458 U.S. 858] at 872-874. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *A reasonable probability is a probability sufficient to undermine confidence in the outcome.*" (P. 694 [80 L.Ed.2d at p. 698], italics added.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (P. 695 [80 L.Ed.2d at p. 698].)[8]

What kind of evidentiary showing will undermine confidence in the outcome of a penalty trial that has resulted in a death verdict? *Strickland, supra,* 466 U.S. 668, and the cases it cites offer some guidance. *United States*

---

[8] California courts follow the same test under the state Constitution. (See *In re Cordero, supra,* 46 Cal.3d 161, 180.)

v. *Agurs* (1976) 427 U.S. 97 [49 L.Ed.2d 342, 96 S.Ct. 2392], the first case cited by *Strickland,* spoke of evidence which raised a reasonable doubt, although not necessarily of such character as to create a substantial likelihood of acquittal. (See p. 113, fn. 22.) *United States* v. *Valenzuela-Bernal* (1982) 458 U.S. 858, 873 [73 L.Ed.2d 1193, 1206, 102 S.Ct. 3440], the second case cited by *Strickland,* referred to evidence which is "material and favorable . . . in ways not merely cumulative . . . ." In *Strickland* itself the majority found trial counsel's failure to investigate additional mitigating evidence nonprejudicial, citing the weight of the aggravating evidence and the fact that the essence of the mitigating evidence had already been presented to the trier of fact through defendant's own words.

(D) *Application of the standard of prejudice in this case.*

*Strickland, supra,* 466 U.S. 668, 697 [80 L.Ed.2d 674, 699], advises that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

We follow that advice here, and conclude that it is not necessary for us to determine whether counsel's failure to investigate further was a reasonable tactical choice, because defendant has failed to prove prejudice under the *Strickland* standard. We rely primarily on three considerations. First, aside from cases of multiple murder, this was one of the more aggravated cases to come before this court. Defendant had previously been convicted of manslaughter. He embarked on his "one-man crime wave" (*People* v. *Fields, supra,* 35 Cal.3d 329, 336) immediately after being released from prison. He kidnapped the murder victim and took her to his house where witnesses saw her, naked and bound, in defendant's bedroom. He forced her to write a check for the balance of her bank account. He later shot and killed her, apparently because she had written a check for less than the full balance. Defendant and a companion then stole a car at gunpoint, kidnapped two prostitutes, raped them both, and severely beat one of them. They then kidnapped another woman, stole her car, and took her to defendant's house, where defendant raped her and attempted to get money from her bank account. Thus the jury heard evidence not only of a murder, but also of a pattern of criminal behavior which, within the short period of three weeks, included at least three kidnappings, rapes, and robberies. We recognize, as habeas corpus counsel points out, that murders with special circumstances are generally horrifying crimes, but that juries nevertheless return verdicts of life imprisonment without possibility of parole in more

than half the cases. But we think that even within this limited sphere of reference, this case is among the most aggravated.

Second, defendant's proof of prejudice at the reference hearing was limited to the testimony of Alice Christopher and the expert witnesses. The force of the expert testimony was diminished by the fact that it was based in large part upon out-of-court declarations of questionable truthfulness and which were not tested by cross-examination. Thus counsel did not show us that defendant could have presented a case in mitigation strong enough to overcome the aggravating evidence.

Finally, unlike the ordinary death penalty case, defendant pled not guilty by reason of insanity. As a result, evidence of defendant's history, background, and mental condition, which would ordinarily be admitted as mitigating evidence at the penalty trial, came before the jury in the sanity trial. Thus the penalty jury, which was instructed to consider the evidence from the guilt and sanity trials, already knew much of the information that ordinarily would not be introduced until the penalty stage.

The evidence before the jury, and the argument of defense counsel at the penalty phase, gave the jury a fairly accurate picture of the case in mitigation. The evidence showed a mentally disturbed man who used illegal drugs.[9] Counsel described the failure of social institutions, which had repeatedly diagnosed defendant's condition and identified him as dangerous and in need of help, but failed to provide that help. Counsel further argued that Fields had lacked parental support and guidance, pointing out that his mother and sister were both implicated in defendant's crimes.

A further investigation by defense counsel might have turned up evidence that would have supported and filled in this picture, but would not have significantly altered the picture. (See *Middleton* v. *Dugger* (11th Cir. 1988) 849 F.2d 491, 495.) The additional evidence would have described defendant's childhood poverty and learning disabilities, but such could at least be inferred from the evidence actually presented. It would tell of his painful rash during childhood and the difficulties it caused him. It would show that his father was a violent alcoholic, and that his mother not only accepted the proceeds of his thefts but actually encouraged him to steal. In light of the evidence before the jury and arguments actually presented at defendant's trial, we cannot find that there is a reasonable probability—i.e., a probabili-

---

[9] In assessing prejudice, we do not weigh the possibility that defendant could have produced evidence showing that his mental disability has the character of a "passive-dependent personality" instead of a "antisocial personality," because we have previously concluded that trial counsel's investigation in this respect did not fall below the minimum standards expected of competent counsel.

ty sufficient to undermine confidence in the outcome—that the additional evidence that might have been discovered would have altered the result.

The petition for habeas corpus is denied.

Lucas, C. J., Mosk, J., Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

Petitioner's application for a rehearing was denied January 24, 1991. Mosk, J., and Broussard, J., were of the opinion that the application should be granted.