Filed 2/10/17 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re GUY DONELL MILES<br><br>　　on Habeas Corpus. | G046534<br><br>(Super. Ct. No. 98NF2299)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

　　THE COURT:

　　It is ordered that the opinion filed herein on January 19, 2017, be modified as follows:

　　1.  On page 9, second full paragraph, change the following last full sentence that appears on that page:

　　"The tow truck driver give his father a receipt" to "The tow truck driver gave his father a receipt."

　　2.  Insert a new footnote 13 on page 24, second full paragraph, after the following sentence:

　　"However, should there be a new trial, our ruling regarding the admissibility of Bailey's declaration is not binding on the trial court."  The new footnote 13 text is the following:  "Bailey's declaration was taken into consideration, but it was not the exclusive basis for granting Miles' petition for writ of habeas corpus.  (See *In re Fields* (1990) 51 Cal.3d 1063, 1070, fn. 3.)  To be clear, even if we were to disregard Bailey's

declaration, we would still grant the petition based on the remaining evidence presented to this court."

3.  On page 36, change the numbering of the previously existing footnote 13 to reflect that it will now be designated footnote 14.

This modification does not change the judgment.

The petition for rehearing is DENIED.


MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.


2

Filed 1/19/17 (unmodified opinion)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re GUY DONELL MILES<br><br>   on Habeas Corpus. | G046534<br><br>(Super. Ct. No. 98NF2299)<br><br>O P I N I O N |

        Original proceedings; petition for a writ of habeas corpus to challenge an order of the Superior Court of Orange County, Frank F. Fasel, Judge.  (Retired judge of the Orange County Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Petition granted.  All requests for judicial notice granted.  Petitioner's request for release on unscheduled bail amount denied.

        California Innocence Project, Jan Stiglitz, Justin Brooks, Alexander Simpson and Alissa Bjerkhoel for Petitioner.

        Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, Garrett Beaumont and Adrianne S. Denault, Deputy Attorneys General for Respondent.

                    *                    *                    *

"The Habeas Corpus secures every man here, alien or citizen, against everything which is not law, whatever shape it may assume." --Thomas Jefferson.

Guy Miles is in state prison for 75 years to life. A jury convicted him of armed robbery and he has been in custody for almost 19 years. For all of those years, Miles has claimed that he was wrongfully convicted. But he has now presented "new evidence" to this court that is of "such decisive force and value that it would have more likely than not changed the outcome at trial." (Pen. Code, § 1473, subd. (b)(3)(A).)[1]

Thus, Miles has secured a writ of habeas corpus.

I

INTRODUCTION

On June 29, 1998, three men committed an armed robbery at a small loan office in Fullerton. Two employees were on duty. Weeks later, both of the victims separately looked at a six-pack lineup and picked out Miles as one of three robbers. Although no physical evidence linked Miles to the crime scene, and several alibi witnesses placed him in Las Vegas on the day of its occurrence, a jury convicted Miles of the armed robbery along with one codefendant.

Miles filed a petition for a writ of habeas corpus in this court, attaching declarations from his codefendant and two other men. All three confessed to their role in the robbery; all three have sworn under penalty of perjury that Miles was not at the loan office and had nothing to do with the robbery. We issued an order to show cause and ordered evidentiary hearings, which have now taken place.

The law has changed since Miles first filed his petition. Prior to January 1, 2017, in order to grant habeas relief, we needed to find that the "new evidence"

---

[1] Further undesignated statutory references will be to the Penal Code.

2

*completely* undermined the prosecution's case and pointed """*unerringly* to innocence.""" (*In re Johnson* (1998) 18 Cal.4th 447, 462, italics added.)  Although the new evidence is compelling, it did not *completely* undermine the prosecution's case, nor did it point *unerringly* to innocence.  The two robbery victims have never wavered in their identifications of Miles as one of the culprits.  And the three confessors are all convicted felons who are likely shielded from prosecution by either the double jeopardy clause or the statute of limitations.  But after Miles filed his petition, the California Legislature lowered the standard for granting habeas corpus relief.  Effective January 1, 2017, habeas relief is now granted when:  "New evidence exists that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial."  (§ 1473, subd. (b)(3)(A).)

Under the recently amended statute, the three confessions qualify as "new evidence" and Miles meets the new standard for habeas corpus relief.  Thus, we will grant the petition and vacate Miles' convictions.  If the prosecution elects to pursue a new trial, the jury will be able to consider the new evidence.  If there is not a new trial within the statutory timeframe, Miles is to be released from custody.  (§ 1382, subd. (a).)


II

FACTUAL AND PROCEDURAL SUMMARY

On June 29, 1998, A. Holguin was working at Trio Auto Parts in Fullerton, which was located in a strip mall next to Fidelity Financial Services (Fidelity).  Just prior to 6:00 p.m., Holguin noticed three black men in a car in the parking lot.  Two of the men, Accomplice One and Accomplice Two, were walking towards Fidelity.  Accomplice Two stared at Holguin and made a hand gesture, which Holguin characterized as a gang sign.  Accomplice Three entered the auto parts store and began

3

talking with Holguin about parts for a 454 engine in a 1975 Caprice, a rare engine for that car.

Accomplice One and Accomplice Two knocked at the front door of Fidelity, which primarily makes car loans to people with bad credit. Employees M. Patlan and T. Gomez were inside. Generally, the front door is unlocked during business hours, but the door is locked when there are only two employees on duty. Patlan unlocked the front door, let the two men in, and returned to his position behind the counter. Accomplice One, who was thin and wearing a suit, said that he wanted to make a car payment for his brother. Accomplice Two, who was stockier and wearing a light colored shirt and jeans, asked if he could use the restroom.

Accomplice Two went to the backroom, passing by Gomez's desk. In less than a minute, Accomplice Two rushed out from the backroom towards the front counter. As he passed Gomez's desk, she looked up and saw the back of Accomplice Two's head. Accomplice Two struck Patlan from behind on the left side of the face and the ear.

Accomplice One walked around the counter, pulled out a big barreled weapon, and demanded money. Gomez was ordered to the ground. Accomplice Two opened a drawer and a filing cabinet and picked up money and a few envelopes. The amount of money taken was later determined to be about $1,400 in cash and about $4,000 in checks. Accomplice Two told Gomez and Patlan to put their hands on their heads and walk to the backroom where the bathroom is located. They were told not to come out or open the door for 15 minutes.

Holguin was still talking with Accomplice Three when he heard a car horn honking. He looked up and saw that Accomplice One and Accomplice Two were back in the car in the parking lot. Holguin told Accomplice Three that he thought his friends wanted him to hurry up. Holguin watched as Accomplice Three got into the car and drove away.

4

*The Investigation*

After waiting 15 minutes, Gomez called 911. She described the suspects as two black males. She said Suspect One was "skinny" and was wearing a green suit. She said Suspect Two was "kind of stocky looking."

When the initial responding officer arrived, Patlan was bleeding from the mouth and right ear. As paramedics took Patlan out in a gurney he noticed a gardening glove near the door at the front entrance. The glove was booked into evidence and later tested for DNA, but the results were inconclusive. The loan office was dusted for fingerprints, but no usable fingerprints were discovered.

Patlan's and Gomez's descriptions of what occurred were largely consistent. Patlan described Accomplice One as follows: tall and thin (about 6'2" and 150 pounds) in his 20's; clean shaven; dark complexion. He said Accomplice One looked like Warren G, a rap celebrity singer. Patlan described Accomplice Two as follows: shorter and stockier (about 5'9" and 200 pounds); round face; no tattoos; possible goatee; dressed in a white polo shirt with jeans. Gomez said that when she was looking up at Accomplice Two she noticed he had a roll in the back of his neck and that he had a chubbiness to his face. Years later, Gomez said that there was no significant height difference between Accomplice One and Accomplice Two.

The next day, the police interviewed Holguin at the Fidelity office. As Holguin told the police what happened at Trio Auto Parts during the robbery, a Fidelity employee overheard the conversation. She retrieved a customer's records and walked up and said, "Is this the person that you saw in your store [?]" She showed Holguin a copy of a driver's license and he said, "That was the person." The photograph was of Bernard Teamer. The police took Teamer's financial records, which disclosed his assets, including a 1975 Chevrolet Caprice. All of the witnesses reported that all three accomplices to the robbery were in their 20's.

A Fullerton police detective investigated the robbery. The detective obtained Teamer's loan documents and started running background checks. The detective found that Teamer was affiliated with the 190 Street Crip gang out of Carson. The detective contacted a Los Angeles Sheriff's Department gang enforcement officer. The gang officer assisted the detective in obtaining possible suspect photographs. The detective conducted surveillance on Teamer, whom he saw with Harold Bailey, one of the three men who later confessed to being involved with the robbery.

The detective assembled several six-pack photographic lineups. The detective tried to include photographs of potential suspects along with people who had a similar appearance to the suspects, i.e., "fillers." In some lineups, the detective placed several suspect photographs in the same lineup.

Prior to showing the witnesses each photographic lineup, the detective gave them a written admonishment, which they read and signed. The admonition stated that any of the photographs may or may not include those involved in the crime. One of the lineups contained a photograph of Bailey, who Gomez said looked similar to Accomplice One.[2] Another lineup contained a photograph of Miles. Gomez positively identified Miles as Accomplice Two. Holguin made a possible identification of Miles as Accomplice Two.

Within a few days of showing the photographic lineups, the detective arrested Miles and Teamer. Miles was arrested in Las Vegas. He waived his constitutional rights and denied any involvement in the robbery. Miles said he knew

---

[2] If the three confessions are to be believed, Bailey was actually Accomplice Two and Jason Steward was Accomplice One. It was stipulated in a later reference hearing that within a year of the robbery Bailey was six feet tall, and weighed 198 pounds, while Steward was six feet, two inches tall, and weighed 155 pounds. On the day of his arrest, Miles was five feet, nine inches tall, and weighed 190 pounds.

Teamer and the first time he had seen Teamer in four to five months was the previous Friday.

The detective notified Patlan by phone that he had apprehended two of the robbers. The detective later met with Patlan who positively identified Miles in photographic lineup as Accomplice Two.

*The Trial*

The People filed an amended information charging Miles and Teamer with two counts of second degree robbery and possession of a firearm by a convicted felon. (§§ 211/212.5, subd. (c), 213, subd. (a)(2), former 12021, subd. (a), repealed by Stats. 2010, ch. 711, § 4; reenacted without substantive change as § 29800, subd. (a)(1) by Stats. 2010, ch. 711, § 6, eff. Jan. 1, 2012.) The information alleged that the offenses were committed for the benefit of a criminal street gang and they were gang-related offenses in which a principal used a firearm. (§§ 186.22, subd. (b)(1), 12022.53, subds. (b) & (e)(1).) The information also alleged Miles inflicted serious bodily injury on Patlan, had been previously convicted of three serious felonies, had three "strike" priors, and had served two prior prison terms. (§§ 12022.7, 667, subds. (a)(1), (b)-(i).)

Nearly a year after the robbery, Miles and Teamer were tried together before a jury. Patlan, Holguin, and Gomez testified as percipient witnesses. In front of the jury, Patlan identified Miles in court as Accomplice Two. Patlan agreed that Miles had marks or indentations on his head, but Patlan said they would not be able to be seen if Miles had a full head of hair. Holguin was not asked to identify Miles in court.

During a break, when the judge and the jury were not present, Gomez could not identify Miles as Accomplice Two. Gomez repeatedly told the prosecutor that she was unable to do so, even after she stood close to Miles at counsel table. But just prior to her testimony, the prosecutor showed Gomez a color copy of Miles' booking photo, with

7

his booking number and arrest date. According to Miles' counsel, this occurred in the hallway. After looking at the booking photo, Gomez then positively identified Miles in court in front of the jury.

The prosecution's gang expert explained criminal street gang culture, slang terms, and behavior. He found significant the presence of multiple tattoos worn by Teamer and Miles. Ultimately, the expert opined that Teamer and Miles committed the Fidelity robbery to benefit their gang. He noted that Miles had been arrested in Las Vegas driving another gang member's car.

*The Defense*

Miles' father Charles testified that at the time of the robbery Miles had been living in Las Vegas for about a year.[3] Miles' 12-year-old son De Andre lived with his mother in Sacramento. Each summer De Andre would visit and stay at his grandparent's home in Carson, which is located in Los Angeles County. Charles arranged for De Andre to visit in the summer of 1998 by purchasing a round-trip flight with an August departure date.[4]

On Saturday, June 27, Charles and his wife Mabel picked up De Andre at Los Angeles (LAX) airport at 8:00 p.m., and brought him home. De Andre called his father in Las Vegas collect that night at 10:20 p.m.[5] Charles was "a little upset about it

---

[3] Because they share a last name, we will refer to Miles' family members by their first names in order to avoid confusion. No disrespect is intended.

[4] A Southwest Airlines ticket was used to refresh Charles' recollection. The document was marked as an exhibit, but it was not admitted into evidence. The court found that the defense attorney did not lay an adequate foundation.

[5] A telephone bill was used to refresh Charles' recollection. The document was marked as an exhibit, but it was not admitted into evidence. The court found that the defense attorney did not lay an adequate foundation.

8

because we thought he was going to spend the summer with us and, the moment he got there, he wanted to call his father and go spend the summer with his father." On Sunday, June 28, they all went to church where Charles worked as a pastor. "Afterwards, we came home, with the rest of the family came over to greet him in Carson – to greet him home. He comes home for the summer, so the whole family was over and, of course, we had dinner and just enjoyed one another and enjoyed him, too."

On Monday, June 29,—the morning of the robbery—Miles picked up De Andre at about 3:00 a.m. Miles was only at his parent's home for 10 minutes at the longest. On cross-examination Charles testified that Miles has friends and family in the area and it wasn't unusual for him to come to the Carson area. Mabel testified consistent with Charles's testimony. Mabel also testified that Miles had been shot 13 years earlier and as a result, he had a noticeable scar from his hairline to his ear and an indenture in his head.

De Andre testified that he flew from Sacramento to Los Angeles. De Andre telephoned his father who was in Las Vegas when he arrived at his grandparent's home. The next day, he went to church with his grandparents and attended a family dinner at their home. Miles picked up De Andre at 3:00 a.m. On the drive to Las Vegas, his father stopped at a 7-Eleven, a gas station, and a McDonalds. They arrived in Las Vegas between 7:00 and 8:00 a.m. His father slept for about 90 minutes. They then drove to meet two of Miles' friends. De Andre was with his father the entire day and spent the night at his home in Las Vegas. The following morning, De Andre saw that his father's car had been broken into the prior night and the column had been damaged. He saw the car being towed. The tow truck driver give his father a receipt.[6]

---

[6] A yellow receipt from Auto Body Plus and a copy of log from the tow yard were used to refresh De Andre's recollection, but they were not admitted into evidence. The court found that the defense attorney did not lay an adequate foundation.

Gloria Perry testified that Miles had been living in Las Vegas since sometime in 1997. She said she saw Miles at his home on Sunday, June 28, 1998, while she was having her hair braided.[7] She said that she saw Miles on the freeway driving towards Los Angeles with his girlfriend sometime between 6:00 and 8:00 p.m. She next spoke to Miles by telephone on Monday, June 29, 1998— the day of the robbery— sometime between 4:45 and 5:00 p.m.

The resident manager of Miles' apartment complex in Las Vegas testified that she spoke to Miles on Monday, June 29, 1998, at around 9:00 a.m., by telephone, and noticed that his car was parked in its normal parking space later in the afternoon. She also saw Miles and his son the following day between 12:00 noon and 2:00 p.m., and testified that Miles' car had been towed.

Patricia Joseph testified that she was Miles' upstairs neighbor at the Las Vegas apartment for five to six months. She testified that late in the evening on June 28, she saw Miles and his girlfriend drive away from the apartment complex. She next saw Miles between 7:00 and 8:00 a.m. the next morning—the morning of the robbery—with his son. Joseph saw Miles again in his apartment between 4:00 and 7:00 p.m. on the same day.[8]

Dr. Scott Fraser is a psychologist, researcher, and professor who testified as an expert in eyewitness memory. Dr. Fraser testified that race and other factors can affect the accuracy of eyewitness memory. According to Dr. Fraser, consistent scientific studies show "the other race effect." Dr. Fraser said that people "are just less accurate in terms of identifying members of a different race." Dr. Fraser also described "photo bias"

---

[7] The date was not stated on the record, but appears to be a logical inference based on the rest of Perry's testimony.

[8] Additional Las Vegas witnesses testified at the habeas corpus hearings. To varying degrees, they generally placed Miles in Las Vegas at or near the date of the crime.

10

as another factor that can affect the accuracy of eyewitness identifications. The "term refers to [the] effects of one recognition test on any subsequent recognition test[s]." That is, a person's memory becomes more vivid because of repeated exposures to photographs. "They can now recall more details of the person, but it is the product of the recognition test. It is not [the product of] the original observation."

*The People's Rebuttal Evidence*

Dr. Ebbe Ebbsen is a psychology professor whose emphasis is in methodology. Dr. Ebbsen said he is a colleague of Dr. Fraser, is familiar with his viewpoints in the area of eyewitness identification, and was highly critical of the methodology of that type of research. Dr. Ebbsen said that the research in the area of eyewitness identification cannot be generalized. He said there are a large number of theories about memory that are available, but they are in competition. "So the point is at this point in time, we don't have what people think of as scientific understanding of human memory." Dr. Ebbsen believed that experts in the field of eyewitness identification should not be rendering opinions in court.

*The Verdict, New Trial Motion, and Sentencing*

The trial had lasted about four weeks. On the third day of deliberations, the jurors sent back a note asking "when does a jury become a hung jury?" The court responded that: "A hung jury is when the jury is hopelessly deadlocked." On the fifth day, the jury convicted defendants of all charges and found true all the enhancements. Later, the court denied Miles' new trial motion. The court also denied a motion to strike any of Miles' three prior strike convictions, which had occurred in one prior incident. The court sentenced Miles to a 75 years to life prison term.

11

*Postjudgment Proceedings*

In 2003, this court reversed both defendants' criminal street gang enhancements for lack of sufficient evidence. In all other respects, the judgments were affirmed. The California Supreme Court later denied petitions for review.

In 2010, Miles filed a petition for writ of habeas corpus in the superior court. Miles made three claims: 1) new evidence of third party culpability; 2) false eyewitness testimony; and 3) actual innocence.[9] The petition included declarations from Teamer, Bailey, and Steward, each stating that they had committed the robbery and Miles was not involved. The superior court granted Miles an evidentiary hearing.

In 2011, prior to hearing testimony, the court was informed that "Bailey will not be coming from Texas, that he has decided he doesn't want to testify under any circumstances." The court heard from five witnesses including Teamer, Steward, and Miles. The trial court denied the writ of habeas corpus finding that the evidence did not undermine the entire prosecution case and did not point unerringly to innocence. The court did not find Teamer, Steward, and Miles to be credible witnesses, based in part on their criminal histories.

In 2012, Miles filed the instant writ petition in this court making the same claims he had made in the superior court. We issued an order to show cause. In 2013, and again in 2016, this court appointed a referee. We asked the referee to conduct evidentiary hearings and to make recommended findings of fact. Several alibi witnesses testified. Teamer, Steward, and Miles each testified again. Bailey again refused to testify. The referee found that Miles did not meet the habeas corpus standard for a new

---

[9] In the intervening years, Miles had filed numerous pro se habeas corpus petitions in both state and federal courts; however, none of those petitions involved the new evidence claim at issue here. We therefore reject the People's contention that Miles is procedurally barred from seeking habeas corpus relief. (See *In re Clark* (1993) 5 Cal.4th 750, 767-769; *In re Reno* (2012) 55 Cal.4th 428, 451.)

12

evidence claim.  Notably, the referee observed that, "this is the type of case which dramatically tests the credibility of California's criminal justice system."

*The Confessions and Related Testimony From the Habeas Proceedings*
Bernard Teamer

Teamer testified that he robbed Fidelity with Steward and Bailey.  Teamer grew up across the street from Bailey, who was known as "Baby K.O.," meaning that he is Teamer's "little homie" and that he follows after Teamer, who is known as "Little K.O."  Bailey listened to and trusted Teamer.  Teamer knew Steward through Bailey and knew Steward as "Tiny Wimp."

Teamer was familiar with Fidelity because he paid his bills there.  He chose Fidelity because "I was just trying to get some money."  Teamer planned the robbery; Steward and Bailey were to go into the Fidelity office and Teamer was to wait in the car.  Teamer and Bailey met at Steward's house the morning of the robbery.  Teamer brought up the idea.  At the time of the robbery, Bailey was about six feet tall and kind of stocky; Steward was also about six feet tall and slim.  Bailey had a dark complexion and had rolls in the back of his neck.

Teamer had met Miles 10 years earlier in Jamestown prison.  After his arrest, Teamer "play[ed] the role" that he didn't have anything to do with the robbery.  Teamer thought that because nobody could "put him" at the robbery, he and Miles were not going to be convicted.

Jason Steward

Steward testified that he grew up in Compton and was involved with the Farm Dog Compton Crips.  June 29, 1998, was Steward's birthday, the day he turned 19 years old.  Bailey and Teamer came to his home and said they had a "lick," meaning a

13

robbery. He said that some of his cousins were present and told him he was crazy to do a robbery on his birthday. On the day of the robbery, Steward was about six feet tall and weighed between 160 and 165 pounds. He said that Bailey was about the same height, but Bailey had more weight on him. Steward had not committed any other crimes with Teamer, but he had with Bailey.

Teamer explained to Bailey and Steward that the location was in Fullerton. Teamer had some kind of dealings with this place before, so he had already scoped it out. The plan was for Teamer to stay in the car, Bailey and Steward were to go inside and get the money then "come back out and get in the car and bone out." Steward recalled that Teamer had also set up another similar robbery in Norwalk, but Teamer was not present. Steward was doing a lot of robberies during this timeframe.

Steward wore a suit because it helped him get access. When they got to Fidelity, Teamer backed into the parking space. Steward hid the shotgun in the sleeve of his suit. Steward got Patlan to open the door by telling him that he had to make a payment. When Stewart and Bailey returned to the car, the car doors were locked and Teamer wasn't there. Steward said they saw Teamer in the auto parts store so they waved and motioned for him to come out. Steward was 100 percent sure that the doors were locked.

In 2007, Steward met Miles in prison for the first time. His "homie" Jahed Prince got a message to him that Miles wanted to speak to him and Prince set up the meeting.[10] Miles showed Steward a document with the date of the robbery on it. Steward couldn't believe that Miles was convicted of the Fullerton robbery because the date stood out in his mind.

---

[10] Prince testified at a habeas hearing and corroborated Steward's testimony.

14

In 2008, the Innocence Project contacted Steward and he wrote a declaration. Steward drew a diagram of Fidelity indicating where they parked, the location of the auto parts store, and the interior of the office indicating the location of the witnesses. At the time, Steward still feared he could be prosecuted and did not remember the Innocence Project discussing the statute of limitations with him. In 2011, Steward was released from parole. He was later arrested and was in custody on an unrelated crime. Steward spoke to Bailey after he spoke to the Innocence Project to see if Bailey would "come forward and say his part in it, I say my part."

Steward said he was not lying. When asked why he would not lie, he said: "Because, actually, I ain't got nothing to gain from lying for him. . . . [¶] Why would I go down with that? Actually makes no sense to lie."

Harold Bailey

On February 5, 2010, Bailey completed a declaration that largely corroborated the testimony of Teamer and Steward. On June 20, 2013, the Fullerton detective interviewed Bailey, who was in a Texas prison. Bailey insisted Miles is innocent. Bailey remembered that he committed a robbery with Steward and Teamer on Steward's birthday. At the time, Bailey said he was young and Teamer was his mentor and he would basically do whatever Teamer asked him to do. Bailey was hanging out at Steward's grandma's house when Teamer approached them about the robbery.

Teamer drove Bailey and Steward out of Los Angeles. Bailey was unfamiliar with the area, and did not remember many of the details of the robbery, but he did remember demanding money. Bailey said that he always had a "meaty neck." Bailey said that he was "pissed off" when they got to the car because Teamer wasn't there.

15

According to Bailey, Steward kept hitting the horn to get Teamer to come out of the auto parts store.[11]

Guy Miles

In 1985, Miles was convicted of possessing marijuana for sales. In 1991, he was convicted of second degree robbery, shooting into a car, and assault with a deadly weapon. He spent five years and eight months in prison, two months of which were with Teamer. Miles said that he saw Teamer every day, but only spoke to him three or four times.

On May 4, 1997, Miles got out of prison and moved to Las Vegas soon after; he would visit Carson every one or two months. He lied to his parole officer about where he was living.

On June 28, 1998, Miles was going to pick up his son from Carson, where he was staying with his parents. De Andre called him and asked if he could stay the summer with him in Las Vegas. On June 29, the day of the robbery, Miles got to Carson around 2:00 or 3:00 in the morning. His son was ready to go and his suitcase was packed. He only stayed a few minutes because he wanted to get back before the sun came up and it got hot. Miles got back to Las Vegas sometime between 7:00 and 8:00 a.m. Miles took a nap when he got back to Las Vegas and then got up and went to see some friends. Miles took his son with him "because he always want[s] to ride with me." As far as the rest of the day, "I just kind of stayed around the house and napped all day."

Miles talked to Teamer several times while they were going to court. Miles repeatedly asked Teamer if he was involved in the crime, but Teamer kept telling him,

---

[11] This testimony is at somewhat at odds with the testimony of other witnesses.

16

"No, I didn't have nothing to do with it." The last day Miles saw Teamer was the day the jury found him guilty.

About three or four months after the trial, Miles found out through friends that Teamer and Bailey committed the robbery. In 2007, Miles found out the identity of the other party involved in the crime, Steward. In prison, another inmate, Roy Dungey, told Miles there was a guy from Compton that he needed to talk to by the name of "Tiny Wimp or Wimp." Miles asked Prince to set up a meeting with Wimp, who turned out to be Steward. After Miles met with Steward, he contacted his parents and told them to call the Innocence Project.

III

DISCUSSION

"The Supreme Court, courts of appeal, superior courts, and their judges have original jurisdiction in habeas corpus proceedings." (Cal. Const., art. VI, § 10.) "The writ of habeas corpus enjoys an extremely important place in the history of this state and this nation. Often termed the 'Great Writ,' it 'has been justifiably lauded as "'the safe-guard and the palladium of our liberties.'"'" (*People v. Villa* (2009) 45 Cal.4th 1063, 1068.)

"[A] habeas corpus proceeding is not a trial of guilt or innocence and the findings of the habeas corpus court do not constitute an acquittal. The scope of a writ of habeas corpus is broad, but in this case, as in most cases, it is designed to correct an erroneous conviction. It achieves that purpose by invalidating the conviction and restoring the defendant to the position she or he would be in if there had been no trial and conviction." (*In re Cruz* (2003) 104 Cal.App.4th 1339, 1346, citing *In re Crow* (1971) 4 Cal.3d 613, 620; see also *In re Hall* (1981) 30 Cal.3d 408, 417.) "[A] successful habeas corpus petition necessarily contemplates and virtually always permits a retrial.

17

[Citations.]  The possibility of a retrial is often assumed without discussion." (*In re Cruz*, *supra*, 104 Cal.App.4th at p. 1347.)

In this opinion we will address:  1) whether the newly amended statute applies to Miles' pending petition; 2) whether the confessions qualify as new evidence; and 3) whether the confessions meet the necessary grounds for granting habeas relief. [12]

*A. Whether the Newly Amended Statute Applies to Miles' Pending Petition*

Generally, both civil and criminal statutes do not apply retroactively to existing causes of action.  (See Code Civ. Proc., § 3; § 3 ["No part of [the Penal Code] is retroactive, unless expressly so declared"].)  "'A retrospective law is one that relates back to a previous transaction and gives it some different legal effect from that which it had under the law when it occurred.'"  (*Ware v. Heller* (1944) 63 Cal.App.2d 817, 821.)  For instance, in criminal law, a statute "is retrospective if it defines past conduct as a crime, increases the punishment for such conduct, or eliminates a defense to a criminal charge based on such conduct."  (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288 (*Tapia*).)  Such substantive changes would also violate the constitutional protection against ex post facto laws.  (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.)

However, if a change in the law relates to "modes of procedure, rather than substance, the law applies to existing causes of action and defenses without having retrospective effect."  (*Sierra Pacific Industries v. Workers' Comp. Appeals Bd.* (2006) 140 Cal.App.4th 1498, 1506; *Tapia, supra*, 53 Cal.3d 282 [statutory change to jury selection process was procedural and applied prospectively to pending criminal trials].)

_____

[12]  In his briefing, Miles argued that "advancements in the field of stranger eyewitness identification," which includes cross-racial identification, also qualifies as "'new evidence.'"  Because we are granting the writ on the basis of the confessions of Teamer, Miles, and Bailey, we need not address this alternative claim.

18

Further, "changes in a statute regulating the burden of proof are to be applied as changes in procedure only." (*Estate of Giordano* (1948) 85 Cal.App.2d 588, 592.)

Miles first filed his petition for a writ of habeas corpus in this court, in part, based on a claim of new evidence. At the time that Miles filed his petition, there was no codified standard of proof for habeas corpus relief based on a claim of new evidence. The standard for such claims was established by the California Supreme Court under principles dating back to 1947. A petitioner needed to present evidence that points "unerringly" to innocence and "completely undermines the entire structure of the case presented by the prosecution at the time of the conviction." (*In re Lindley* (1947) 29 Cal.2d 709, 724.)

Then, during the pendency of these proceedings, the Legislature changed the burden of proof. (§ 1473, subd. (b)(3)(A).) Effective January 1, 2017, the burden of proof in a new evidence habeas claim is significantly lower, but this is merely a change in procedure. Further, the statutory change is only being applied in a prospective manner because at the time the new law became effective we had not yet made a decision.

Thus, we will apply the recently amended statute to the resolution of Miles' pending habeas corpus petition (as the Attorney General concedes we must).

*B. Whether the Confessions Qualify as "New Evidence"*

The definition of "new evidence" under the newly enacted habeas statute is "evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative, collateral, or impeaching." (§ 1473, subd. (b)(3)(B).) The new statutory habeas standard for new evidence is similar to the "new evidence" standard in a motion for new trial under California law. (§ 1181.)

19

"When a verdict has been rendered or a finding made against the defendant, the court may . . . grant a new trial, in the following cases . . . : [¶] . . . [¶] [w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. (8).) "A defendant on a motion for a new trial based on newly discovered evidence must show inter alia that the evidence is in fact newly discovered; that it is not merely cumulative to other evidence bearing on the factual issue; that it must be such as to render a different result probable on a retrial; and that the moving party could not, with reasonable diligence, have discovered and produced the evidence at trial." (*People v. McDaniel* (1976) 16 Cal.3d 156, 178.)

The new statutory habeas standard for new evidence is also comparable to the "newly discovered evidence" standard in a motion for new trial under federal law. (Fed. Rules Crim. Proc., rule 33.) "In order to prevail on a Rule 33 motion based on newly discovered evidence, the movant must show that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of defendant." (*U.S. v. Colon-Munoz* (1st Cir. 2003) 318 F.3d 348, 358.)

1. The evidence could not have been discovered prior to trial through the exercise of due diligence.

The former habeas standard for new evidence claims required that a habeas petitioner act with "'reasonable diligence'" in presenting his or her claim. (See *In re Hardy* (2007) 41 Cal.4th 977, 1016 [the petitioner's evidence was not "'newly discovered'" because it was reasonably available to him prior to trial "had [he] conducted a reasonably thorough pretrial investigation"].) The terms "'reasonable diligence'" and

20

"due diligence" are essentially interchangeable. (See *People v. Cromer* (2001) 24 Cal.4th 889, 892; see also *People v. Herrera* (2010) 49 Cal.4th 613, 622.)

"What constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case. [Citation.] The term is incapable of a mechanical definition. It has been said that the word 'diligence' connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citation.] The totality of efforts of the proponent to achieve presence of the witness must be considered by the court. Prior decisions have taken into consideration not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly . . . , whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation]." (*People v. Linder* (1971) 5 Cal.3d 342, 346-347.)

Here, Miles could not reasonably have been expected to "discover" the confession of Teamer prior to trial because Teamer did not plead guilty and was a codefendant in the same trial. Moreover, if Miles' testimony is to be believed, at least on this point, Teamer had continuously represented to Miles during the trial that he had no involvement in the robbery. As to Steward, Miles could not have reasonably been expected to "discover" his involvement in the robbery because at the time of the trial Steward had not been identified as a suspect. And although the Fullerton detective suspected from the beginning that Bailey was involved in the robbery (and still does), none of the eyewitnesses who saw his photo in the six-pack lineup positively identified him as a suspect. Thus, based on the facts of this case, we find that the confessions could not have been discovered prior to trial by the exercise of due diligence.

2. The confessions are admissible.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) "'Relevant evidence' means evidence . . . having any

21

tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) A habeas proceeding is subject to the California Rules of Evidence. (*In re Fields* (1990) 51 Cal.3d 1063, 1070.) However, a writ of habeas corpus serves a "traditional function as a *flexible* procedural remedy of last resort to prevent severe and manifest injustice." (*In re Clark* (1993) 5 Cal.4th 750, 803, italics added (conc. & dis. opn. of Kennard, J.).) Habeas corpus "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty." (*Jones v. Cunningham* (1963) 371 U.S. 236, 243.)

Under the comparable federal standard for "newly discovered evidence" in a motion for a new trial, the question is whether the evidence "would be admissible" at the new trial. (See *United States v. Byrne* (E.D. Pa. 1978) 451 F.Supp. 109, 112 ["To the extent that this 'newly discovered evidence' in some way relates to an understanding entered into between a Government agent and the witness, it would be admissible"]; *United States v. Stromberg* (S.D.N.Y. 1959) 179 F.Supp. 278, 279-280 ["Furthermore, the polygraph test report could not possibly produce a different result at a new trial, for clearly it would not be admissible"].)

Here, there is no question that the confessions of Teamer and Steward are admissible because in addition to their sworn declarations, both of them testified at the habeas hearings and subjected themselves to the crucible of cross-examination. And presumably both of them are willing to testify at a new trial if it should occur. The admissibility of Bailey's confession is a different question because at the present time, it is strictly in the form of a declaration made out of court, it is being offered for its truth, and it is therefore hearsay. (Evid. Code, § 1200, subd. (a).)

Ordinarily, "an out-of-court declaration is hearsay, and unless subject to some exception permitting it to be admitted, should be excluded upon timely and proper

22

objection." (*In re Fields*, *supra*, 51 Cal.3d at p. 1070.) "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) Generally, unavailability is found when a court is unable to compel the witness to appear in court. (Evid. Code, § 240, subd. (a)(3).) It is unclear whether a defendant's right to compulsory process that attaches at trial in a criminal proceeding also applies to a habeas corpus evidentiary hearing. (*In re Williams* (1994) 7 Cal.4th 572, 603.)

The "'focus'" of the hearsay exception for declarations against interest is "'the basic trustworthiness of the declaration'"; the determination "whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception. Such an endeavor allows, in fact demands, the exercise of discretion." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1251, disapproved on another ground by *People v. Edwards* (1991) 54 Cal.3d 787, 835.)

Here, on February 5, 2010, Bailey admitted to committing the robbery on June 29, 1998. His statement was made in a handwritten declaration, which was attached to Miles' petition. Later, on June 20, 2013, detectives from the Orange County District Attorney's office interviewed Bailey in a Texas prison. Bailey confirmed that he had written the declaration, but he has refused to testify at the habeas corpus hearings. Ordinarily, Bailey's unavailability might allow his statement to be admitted under the hearsay exception for statements against penal interest. However, the statute of limitations has long passed; therefore, Bailey is not subjecting himself to criminal

liability by admitting to a crime. Further, the superior court has never formally found Bailey to be "unavailable" as a witness.

Nonetheless, our primary consideration is whether Bailey's confession is "trustworthy" or not. We are also mindful that in the context of a habeas corpus petition, we can more flexibly apply evidentiary rules to achieve the interest of justice. While Bailey may have "nothing to lose" by confessing to a crime after the statute of limitations has run, he also has apparently absolutely nothing to gain. Further, Bailey was in a Texas prison at the time he made his statement, which may have subjected him to negative penal consequences, particularly as to his parole eligibility date. Bailey's statements are consistent with those of Teamer and Steward, as well as other corroborative witnesses presented during the course of the habeas hearings. Moreover, Bailey may be out of prison and willing to testify by the time a new trial occurs; thus, his confession may be admissible in a new trial.

Under the unique circumstances of this case, we consider the confession of Bailey, as well as Teamer and Steward, to pass the threshold of admissibility for the limited purpose of this habeas proceeding. However, should there be a new trial, our ruling regarding the admissibility of Bailey's declaration is not binding on the trial court.

3. The confessions are not merely cumulative, corroborative, collateral, or impeaching.

The "merely cumulative, corroborative, collateral, or impeaching" element of the new statutory definition of "new evidence" for habeas corpus purposes is similar to the considerations for excluding evidence under Evidence Code section 352. "Cross-examination is subject to restriction under Evidence Code section 352 if it is cumulative or if it constitutes impeachment on collateral issues." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 352.) "Because the prosecution intended to offer other evidence which would tend to prove the same facts, [the witness'] testimony was cumulative. But trial

24

courts are not required to exclude all cumulative evidence and if evidence has substantial relevance to prove material facts which are hotly contested and central to the case, it is not '*merely cumulative*.'" (*People v. Lang* (1989) 49 Cal.3d 991, 1016, italics added, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

A "trial court has discretion to exclude impeachment evidence . . . if it is collateral, cumulative, confusing, or misleading." (*People v. Price* (1991) 1 Cal.4th 324, 412.) In this context, "impeach" means that the new evidence would tend to discredit the testimony of a prosecution witness who testified a trial. (*United States v. Atkinson* (E.D.N.C. 1977) 429 F.Supp. 880, 885 ["Newly discovered evidence that merely goes to impeach the credibility of a prosecution witness does not ordinarily warrant the granting of a new trial, [citations]; but in some circumstances the newly discovered evidence, although impeaching[,] is sufficiently important in the ascertainment of the truth and in the interests of justice that a new trial should be ordered"].)

Here, there is no dispute that three men committed an armed robbery at the Fidelity office in Fullerton on June 29, 1998. The only contested issue at Miles' and Teamer's consolidated jury trial was the identity of the robbers. Therefore, any conflicting testimony regarding the identity of the robbers is not merely "collateral."

It is true that the new confessions are "cumulative" and "corroborative" in a sense because they tend to bolster Miles' alibi defense at trial; specifically, that he was in Las Vegas at the time of the robbery. The confessions are also "impeaching" in a sense because they tend to discredit the positive identifications of Miles as Suspect Two by the victims of the robbery, Patlan and Gomez. But under circumstances where an innocent man may be languishing in prison, it is apparent that the confessions on the whole are "sufficiently important in the ascertainment of truth" that they are not "merely" cumulative, corroborative, or impeaching. (§ 1473, subd. (b)(3)(B).)

*C. Whether the Confessions Meet the Necessary Grounds for Relief*

Again, when Miles first filed his petition, in order to grant habeas relief, we needed to find that the "new evidence" completely undermined the prosecution's case and pointed unerringly to innocence. (*In re Johnson*, *supra*, 18 Cal.4th at p. 462.) Now, in order to grant relief, we need to find that the confessions are "credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A).) We find that the confessions meet the necessary grounds for relief.

1. The confessions, on the whole, are credible.

Generally, a "court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing." (Evid. Code, § 780.) In determining whether the confessions of Teamer, Steward, and Bailey are credible, we are generally guided by the same factors that a jury is instructed to consider. "In deciding whether testimony is true and accurate, use your common sense and experience." (CALCRIM No. 226.)

In evaluating a witness's testimony, jurors are instructed to "consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." (CALCRIM No. 226.) "Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently." (CALCRIM No. 226.)

"Because appellate courts are ill-suited to conduct evidentiary hearings, it is customary for appellate courts to appoint a referee to take evidence and make recommendations as to the resolution of disputed factual issues." (*People v. Romero* (1994) 8 Cal.4th 728, 740.) "The central reason for referring a habeas corpus claim for

26

an evidentiary hearing is to obtain credibility determinations [citation]; consequently, we give special deference to the referee on factual questions 'requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying' [citation]." (*In re Thomas* (2006) 37 Cal.4th 1249, 1256.) However, an appellate court can reach a different conclusion than the referee regarding factual findings based "on an independent examination of the evidence produced at the hearing." (*In re Hitchings* (1993) 6 Cal.4th 97, 109; *People v. Ledesma* (1987) 43 Cal.3d 171, 219.)

Here, Miles filed a verified habeas corpus petition and attached affidavits from Teamer, Steward, and Bailey. They each admitted to their role in the robbery and claimed that Miles had nothing to do with it. Based on this, we found that there was "a reasonable likelihood that [Miles] may be entitled to relief." (Cal. Rules of Court, rule 8.386(f)(1).) We appointed a referee to conduct evidentiary hearings and asked him to make credibility determinations. The referee conducted evidentiary hearings and eventually heard testimony from over 20 witnesses, including many of the same alibi witnesses that had testified at trial. The referee made "findings of fact" based on the questions we had put to him. Each answer was supported by extensive analysis.

As to Teamer, Steward, and Miles, the referee concluded that they were either not "inherently" or "compellingly credible." For instance, as to Steward, the referee stated that: "While his recent testimony concerning the robbery that resulted in [Miles'] conviction could be true, the referee cannot conclude that Mr. Steward has any *inherent* credibility." (Italics added.) In his final report, the referee concluded: "[T]he referee believes that, based on all of the testimony he has heard and all of the evidence that he has reviewed, [Miles] 'could in fact be innocent of the robbery at Fidelity Financial Services on June 29, 1998.' Likewise, based on all of the testimony he has heard and the evidence he has reviewed, the referee believes that the inculpatory

27

eyewitness identifications that resulted in [Miles'] conviction could be honest and accurate. If that is the case, then [Miles] is guilty of that robbery."

We take note that the referee was not definitive in the language that he chose to use. The referee did not explicitly tell us that he found the confessing witnesses to be "credible." Nor did the referee explicitly tell us that he found them to be "not credible." But we have no qualms with the referee's choice of language; indeed, we are of the same mind. We recognize that unlike the ultimate decision we are required to make in this proceeding—whether to grant Miles a writ of habeas corpus or not— credibility is seldom a binary choice. We suspect that this is the same tough decisionmaking process that faces many jurors in criminal trials. That is, while jurors must ultimately make a final decision—was there proof beyond a reasonable doubt or not—they must often first evaluate the credibility of witnesses, each of whom may have various gradations of credibility. In that spirit, we briefly share some of our "deliberations."

As to Teamer, we recognize that he was, and may still be, an active member of the same criminal street gang as Miles. Therefore, Teamer may conceivably have some motive to lie on Miles' behalf. Teamer also has four prior convictions, including convictions for burglary and robbery. But Teamer apparently no longer lives in the same Carson neighborhood that he used to; he is married, has eight children, and now operates a trucking business in Lancaster, California. Further, Teamer testified in two separate habeas proceedings and his testimony has been consistent. Teamer's testimony is also remarkably consistent with the statements of Steward, Bailey and Miles.

As to Steward, he has some of the same credibility issues as Teamer. He is a longtime gang member with a violent criminal history. In fact, Steward is currently serving a prison sentence of 171 years to life as a result of three second degree murder convictions due to driving under the influence. But there is no evidence that Steward had

28

any motive to aid Miles. Steward is not a member of the same gang as Miles, there is a large age disparity between Steward and Miles, and there is no evidence that they were ever friends, or that they had ever even met each other prior to meeting in prison years after the robbery. Further, 15 years after the robbery, Gomez and Patlan tentatively identified Steward as Accomplice One, the thin robber.

But probably what is most corroborative of Steward's credibility in our evaluation is the way his statements came to light. At one of the habeas hearings, Rory Dungey testified that he met Steward in prison in 2003. According to Dungey, Steward had told him that he had committed a robbery with Teamer and Bailey, and that Bailey had fled to Texas. Then, in 2007, apparently by coincidence, Dungey met Miles in a different prison. Miles told Dungey that he was wrongfully convicted and he thought that Teamer and Bailey had done the robbery with a third man whose identity he didn't know. It was then that Dungey told Miles about Steward and what Steward had told him years earlier. A meeting between Steward and Miles was then arranged by another person in prison, Prince. Prince had met Miles in prison and he thought Miles "was like a weirdo because he was always telling people he was innocent." According to Prince, when he asked Steward about the robbery, Steward said, "Yeah, that was me. I heard it was a guy who got locked up from [their] neighborhood that had nothing to do with it, but I don't know his name. I don't know him."

If we were to assume that Steward is lying on Miles' behalf, it would make absolutely no sense to involve two other people (Dungey and Prince) in the fabricated story. In short, the testimony of Steward simply has the "ring of truth" about it. And the testimony of Dungey, Prince, Teamer, and Miles, as well as Bailey's declaration, is fully corroborative of Steward's testimony.

As to Bailey, he has the same general credibility issues as Teamer and Steward. That is, he is a long-time criminal and is in the same gang as Miles. Further, he

29

has not subjected himself to cross-examination.  But Bailey is also admitting to a crime when there is no apparent motive for him to do so.  Further, he was seen with Teamer days after the robbery and he has always been a suspect, at least according to the Fullerton detective, the person most familiar with the investigation from the beginning.

And as to all of the defense witnesses, the prosecution has never presented any evidence demonstrating any form of collusion among them.  Indeed, the testimony of Teamer, Steward, and Bailey differs somewhat.  But we find those minor discrepancies consistent with the instructions the jury is given regarding the credibility of witnesses: "Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not.  People sometimes honestly forget things or make mistakes about what they remember."  (CALCRIM No. 226.)  In sum, given the totality of circumstances, we find the confessions of Teamer, Steward, and Bailey sufficiently credible to warrant habeas relief.

2. The confessions are material and were presented without substantial delay.

The phrase "material evidence" is defined as:  "That quality of evidence which tends to influence the trier of fact because of its logical connection with the issue. Evidence which has an effective influence or bearing on question in issue."  (Black's Law Dictionary (6th ed. 1990) p. 976, col. 2.)  "[A] matter is 'collateral' if it has no logical bearing on any *material*, disputed issue."  (*People v. Contreras* (2013) 58 Cal.4th 123, 152, italics added.)  Here, we have already determined that the confessions are not merely "collateral."  Thus, we have necessarily determined that the confessions are also "material."

As to timeliness, it has long been a requirement that all habeas petitions must be timely filed without "substantial delay."  (*In re Robbins* (1998) 18 Cal.4th 770, 778.)  "Substantial delay is measured from the time the petitioner or his or her counsel

30

knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim. A petitioner must allege, *with specificity*, facts showing when information offered in support of the claim was obtained, and that the information neither was known, nor reasonably should have been known, at any earlier time." (*Id.* at p. 780.)

Here, Miles apparently first contacted attorneys from the California Innocence Project in 2002. Since that time, the Innocence Project has documented its attempts to develop evidence in support of Miles' habeas corpus petition. In 2007, Miles first became aware of and spoke to Steward. But it was not until 2010, that Teamer and Bailey agreed to provide declarations. And after an unsuccessful attempt in the superior court, Miles then filed a habeas corpus petition in this court in 2012. Based on the reasonable delays in obtaining evidence in support of his claims, and the delays inherent in postconviction proceedings, it appears to this court that Miles presented the confessions without substantial delay.

3. The confessions more likely than not would have changed the outcome at trial.

The standard of "more likely than not" is close to, but does not have the same meaning as the familiar prejudice standard appellate courts use when determining whether state law error affected the outcome of a trial. (See *People v. Watson* (1956) 46 Cal.2d 818, 836-837; *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 918 ["'probability' for purposes of determining whether state law error affected the trial outcome does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility"].) Nor does "more likely than not" have the same meaning as the prejudice prong in an ineffective assistance of counsel claim. (See *Strickland v. Washington* (1984) 466 U.S. 668, 693-694; *In re Cordero* (1988) 46 Cal.3d 161, 180 [a "reasonable probability" is not a showing that "'counsel's conduct more likely than not

31

altered the outcome in the case,'" but simply "'a probability sufficient to undermine confidence in the outcome'"].)

Rather, the phrase "more likely than not" has the same meaning as the phrase "'preponderance of the evidence,'" the familiar burden of proof in civil proceedings. (See *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205.) "In a civil case the party with the burden of proof must convince the trier of fact that its version of a fact is more likely than not the true version. Stated another way, it requires the burdened party 'to convince the trier of fact that the existence of a particular fact is more probable than its nonexistence—a degree of proof usually described as proof by a preponderance of the evidence.'" (*Ibid.*) "Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true." (CALCRIM No. 1191.)

Further, in this context, the probability of a "changed outcome" includes not only the probability of an acquittal, but also that the confessions "more likely than not" would have resulted in a deadlocked or a hung jury. (See *People v. Mason* (2013) 218 Cal.App.4th 818, 826 ["The error is not harmless because, even if a properly instructed jury would not have voted to acquit [defendant], the views of some jurors may have been swayed resulting in a hung jury. That is a result more favorable to [defendant]]"; see also *People v. Bowers* (2001) 87 Cal.App.4th 722, 735-736 [the court found prejudice where "it is reasonably probable the case would have ended in a mistrial; a more favorable result for defendant than conviction"].)

In evaluating whether it "is more likely than not" that the confessions would have changed the outcome of the trial, we consider the overall "closeness" of the case. (See *People v. Newson* (1951) 37 Cal.2d 34, 46 ["When the case against a defendant is a close one, an error which otherwise would not be prejudicial may justify a

32

new trial"].)  A case will be considered close, for example, where it turns primarily on the credibility of witnesses.  (*People v. St. Andrew* (1980) 101 Cal.App.3d 450, 465 ["The case is a close one, turning primarily upon the respective credibility of the two principal witnesses"].)  An additional factor to consider is where the evidence is sharply conflicting.  (*People v. Hadley* (1948) 84 Cal.App.2d 687, 693 ["It is only '"in a close case where the evidence is sharply conflicting, substantial, and serious errors vital to defendant that may have resulted in a miscarriage of justice must be regarded as prejudicial and grounds for reversal"'"].)

Here, this was undoubtedly a close case in which no forensic or photographic evidence linked Miles to the crime scene.  The prosecution's case, at least as to Miles, turned entirely on the testimony of two eyewitnesses, Patlan and Gomez.  While those witnesses were confident in their in-court identifications of Miles, the jury had also heard evidence regarding the difficulties in eyewitness identifications, including cross-racial identifications.  On the other hand, the defense evidence stood in sharp conflict to the prosecution's case and put Miles in Las Vegas on the day of the robbery.  Indeed, the jurors deliberated for five days and on the third day they had asked for clarification as to when a jury is considered a "hung jury."  Although this information concerning the jury's deliberations is not conclusive, it does indicate that the jury may have been closely divided on the question of Miles' identity as Accomplice Two.

Stated in a summary fashion, we restate the following particular items of evidence to support our probability analysis (some points are necessarily duplicative of our credibility determinations):

- Teamer admitted his role in the robbery and identified Steward as Accomplice One and Bailey as Accomplice Two.  Over the course of two habeas hearings, which were conducted three years apart from each other and over a decade after the robbery, Teamer steadfastly testified that Miles was not involved

33

despite withering cross-examination. While Teamer had nothing to lose by claiming Miles was not involved, it was not shown that Teamer had anything to gain.

- Steward admitted his role in the robbery as Accomplice One and said that he committed the crime with Teamer (Little K.O.) and Bailey (Baby K.O.). Steward remembered that day specifically because it was his 19th birthday. Steward was not clear on several details of the robbery, but neither was Teamer, who we know for sure was present. Steward also steadfastly testified that Miles was not involved despite withering cross-examination during the course of two habeas hearings. While Steward had nothing to lose by admitting his involvement in the robbery (due to the statute of limitations), he also appears to have absolutely nothing to gain. Further, years later, Patlan and Gomez tentatively identified Steward as Accomplice One.

- Bailey admitted his role in the robbery in a declaration. His account was largely consistent with Teamer and Steward. In an interview conducted by the Fullerton detective in a Texas prison, Bailey repeatedly and emphatically stated that Miles was not involved. Bailey was also not clear on all of the details of the robbery, but neither were Teamer and Steward. The detective observed Bailey with Teamer days after the robbery. Teamer was apparently Bailey's mentor in the gang.

- Several eyewitnesses testified that Miles was in Las Vegas on the day of the robbery. Miles was arrested in Las Vegas. The testimony of Miles' mother, father, and son, regarding the date of his arrival in Carson and his subsequent phone calls to Las Vegas were corroborated by flight and telephone records. However, the jury did not get to consider those records because they were not admitted into evidence, and the prosecutor argued the lack of "hard evidence"

34

during her closing argument while questioning the validity of Miles' alibi witnesses.  Further, it would not make sense to fabricate such a complex story.

- While Miles is five feet, nine inches tall, and fits the initial height description of Accomplice Two, Gomez later told the detective that she thought the two robbers were close to the same height.  Further, it appears likely that Gomez and Patlan may have had some effect on each other's descriptions, at least to some extent.  For instance, when the 911 operator asked Gomez the color of the suit that Accomplice One was wearing, Gomez said to Patlan, "Was it a brown color . . . , the suit?  What color suit was . . . green?  A dark green."

- The witnesses described all of the robbers as being in their 20's.  On the date of the robbery, Teamer was 25 years old, Steward was 19 years old, and Bailey was 20 years old.  Miles was 32 years old on the day of the robbery, which also tends to corroborate the habeas testimony that Miles was never a close confidant of either Teamer, Steward, or Bailey.

- Miles' testimony about how he learned of the identity of Steward was very detailed and identified multiple witnesses, among them:  Dungey, Prince, and Steward.  If Miles and Steward deliberately fabricated this story, it would defy logic to name multiple other witnesses.  Further, the corroborative testimony was particularly compelling because of each witness' level of detail and the fact that Dungey and Prince had apparently nothing whatsoever to gain by testifying.

In sum, we find it more likely than not that the confessions of Teamer, Steward, and Bailey would have changed the outcome of the trial; that is, either an acquittal or a deadlocked jury.

35

IV

DISPOSITION

Miles' petition for a writ of habeas corpus is granted. His convictions are vacated. The prosecution may elect to retry Miles within the statutory timeframe. Otherwise, Miles is to be released from custody. [13]

MOORE, ACTING P. J.

WE CONCUR:

ARONSON, J.

FYBEL, J.

---

[13] To clarify, we are granting the writ of habeas corpus solely on the basis of the recently enacted statutory "new evidence" standard (§ 1473, subd. (b)(3)(A)); we are not granting the writ on the basis of Miles' free standing "actual innocence" claim (*In re Hardy*, *supra*, 41 Cal.4th at p. 1016); nor are we finding Miles to be "factually innocent." (§ 1485.55, subd. (d).) Additionally, we are denying Miles' request to be immediately released on his own recognizance. (§ 1506.) However, we are not forestalling the possibility of the superior court granting such a request when the matter is returned to its jurisdiction.

36

Moore, J., Concurring.

I write separately because I believe there were significant problems with the eyewitness identifications, including suggestive photographic lineups and improper prosecutorial tactics, which resulted in Miles' conviction. The majority opinion does not find Miles to be "factually innocent." But there is a very strong likelihood that an innocent man has spent almost 19 years in custody for a crime he did not commit.

There are several procedural safeguards that exist to protect against the misidentification of suspects, such as the double-blind administration of photographic lineups. But many of these safeguards were not followed in this case. Therefore, in addition to his "new evidence" claim, I am of the opinion that there was sufficient proof to support Miles' alternative claim of "false" eyewitness identification evidence.

It should be noted that this investigation took place many years ago when the study of eyewitness identification evidence was in its early stages. As the field progresses, we are learning just how vital photographic lineup safeguards are to fair prosecutions. There is nothing in this record that indicates that the investigating detective acted with improper motives. In fact, at one point the detective stated that: "the last thing I've ever wanted to do as a law enforcement officer is to put an innocent man in jail." I take him at his word.

*The Test for False Evidence*

"A writ of habeas corpus may be prosecuted for, *but not limited to*, the following reasons: (1) False evidence that is substantially material or probative on the issue of guilt or punishment was introduced against a person at a hearing or trial relating to his or her incarceration." (§ 1473, subd. (b), italics added.) False evidence claims may be pursued on the grounds of false eyewitness identifications. (See, e.g., *In re Bell*

37

(2007) 42 Cal.4th 630; *In re Roberts* (2003) 29 Cal.4th 726; *In re Hall* (1981) 30 Cal.3d 408.)

The term "false" evidence should not be understood to somehow mean "falsified" evidence or "fabricated" evidence. (See *In re Hall*, *supra*, 30 Cal.3d at p. 424 [issuance of writ of habeas corpus was justified on ground that identification testimony "was false, albeit unintentionally so"].) A habeas petitioner is not required to show that false evidence was the result of perjury, or that prosecution or its agents were aware of the false nature of the evidence. (§ 1473, subd. (c).) Various dictionaries define the word "false" in different ways, but in the context of a habeas corpus claim, "false" evidence most closely means that the evidence was "not genuine." (Webster's 11th Collegiate Dict. (2007) p. 451, col. 1; compare *People v. Bamberg* (2009) 175 Cal.App.4th 618, 627.)

In order to evaluate a false evidence claim in the context of a habeas corpus petition, courts engage in a two-step analysis. First, a habeas petitioner seeking relief must show by a preponderance of the evidence "that false evidence was offered against him at trial." (*In re Richards* (2012) 55 Cal.4th 948, 976.) Second, courts then evaluate whether that "false evidence was material." (*In re Richards* (2016) 63 Cal.4th 291, 312 (*Richards*).) That is, courts look at the false evidence and ask whether it was of such significance "'that *with reasonable probability* it *could have* affected the outcome.'" (§ 1473, subd. (b); *In re Sassounian* (1995) 9 Cal.4th 535, 546.)

*The Pretrial Photo Identifications of Miles Were Unduly Suggestive*

The United States Supreme Court has held that a conviction must be reversed, because of the lack of due process, where false eyewitness identification at trial followed a pretrial photo identification procedure that was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons*

2

*v. United States* (1968) 390 U.S. 377, 384; *People v. Thomas* (2012) 54 Cal.4th 908, 931.)  An identification procedure violates due process where it is conducive to mistaken identification.  (*Stovall v. Denno* (1967) 388 U.S. 293, 301-302.)

"'[I]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.'"  (*United States v. Wade* (1967) 388 U.S. 218, 229, fn. 8, citing Williams and Hammelmann, *Identification Practices, Part I* (1963) Crim. L. Rev. 479, 482.)   ""'In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive, and unnecessary, if so, (2) whether the [in-court] identification itself was nevertheless reliable under the totality of the circumstances . . . .""'"  (*People v. Thomas*, *supra*, 54 Cal.4th at p. 930.)

Eyewitness misidentification is widely acknowledged as the "greatest cause of wrongful convictions."  (*State v. Henderson* (2011) 208 N.J. 208, 231 (*Henderson*).)  In *Henderson,* the New Jersey Supreme Court conducted an extensive survey of scientific studies of eyewitness identifications and memory.  The court initiated and largely adopted a Special Master's report that evaluated "scientific and other evidence about eyewitness identifications.  The Special Master presided over a hearing that probed testimony by seven experts and produced more than 2,000 pages of transcripts along with hundreds of scientific studies."  (*Id*. at pp. 217-218.)

There are several "estimator variables" or factors peculiar to the circumstances of the crime that can affect the reliability of witness identifications.  (*Henderson*, *supra*, 208 N.J. at pp. 261-273.)  These types of factors have long been taken into consideration in California courts and include such things as the witness's

3

degree of stress, the ability of the witness to observe the suspect, and the problems involved in cross-racial identifications. (*Ibid.*, see also CALCRIM No. 315 [factors a jury can consider when evaluating eyewitness testimony].) Indeed, the jury in Miles' trial heard competing expert testimony regarding these factors and was instructed to consider the impact of those factors when evaluating the eyewitness evidence.

But more importantly, when it comes to due process considerations, there are "system variables," which can also greatly affect the reliability of eyewitness identifications. These are factors that are entirely within the control of law enforcement, such as how lineups are constructed and how identification procedures are conducted. (*Henderson, supra,* 208 N.J. at pp. 248-261.) In this case, Miles' jury was not instructed regarding these "system variables," nor did the jury hear any expert testimony on this subject. That testimony only came from an expert who testified in the first habeas proceeding and the prosecution did not rebut that testimony.

The manner in which a photo lineup is constructed can affect the reliability of a witness' identification. (See *People v. Johnson* (2010) 183 Cal.App.4th 253, 272; *People v. Cook* (2007) 40 Cal.4th 1334, 1355.) "Properly constructed lineups test a witness' memory and decrease the chance that a witness is simply guessing." (*Henderson*, *supra*, 208 N.J. at p. 251.) In *Henderson*, the New Jersey court summarized several guidelines that law enforcement generally follow in order to construct a fair lineup. (*Id.* at pp. 251-262.)

First, "lineups should not feature more than one suspect. As the Special Master found, 'if multiple suspects are in the lineup, the reliability of a positive identification is difficult to assess, for the possibility of 'lucky' guesses is magnified.'" (*Henderson*, *supra*, 208 N.J. at pp. 251-252.) This principle seems to be logical and self-evident. The eyewitness evidence expert who testified at the habeas hearing said that the whole purpose of having one suspect and five "fillers" in a six-pack photographic lineup

4

is to protect against mistaken identification.  He said that:  "As you increase the number of suspects in the lineup, you're increasing the chance of error rate that somebody's going to be selected.  You're actually violating the whole point of doing a six pack or a lineup."  Further, the suspect photo should also be placed randomly in the six-pack lineup.  "Consider placing suspects in different positions in each lineup, both across cases and with multiple witnesses in the same case.  Position the suspect randomly in the lineup."  (U.S. Dept. of Justice Research Report, Eyewitness Evidence, A Guide for Law Enforcement (Oct. 1999) p. 30.)

Second, "lineups should include a minimum number of fillers.  The greater the number of choices, the more likely the procedure will serve as a reliable test of the witness' ability to distinguish the culprit from an innocent person."  (*Henderson*, *supra*, 208 N.J. at p. 251.)  There is "no magic number [that] exists, but there appears to be general agreement that a minimum of five fillers should be used."  (*Ibid.*)  In California, there is no per se requirement, but it appears that a six-pack photo array containing five fillers is the norm.  (See, e.g., *People v. Carlos* (2006) 138 Cal.App.4th 907, 911.)  Indeed, the federal guidelines from the Department of Justice state that when composing a photographic lineup the investigator should:  "Include a *minimum* of five fillers (nonsuspects) per identification procedure."  (U.S. Dept. of Justice Research Report, Eyewitness Evidence, A Guide for Law Enforcement, *supra*, at p. 29.)

Third, and probably most important, "a suspect should be included in a lineup comprised of look-alikes. The reason is simple:  an array of similar looking people forces witnesses to examine their memory.  In addition, a biased lineup may inflate a witness' confidence in the identification because the selection process seemed easy."  (*Henderson*, *supra*, 208 N.J. at p. 251.)  Indeed, it has long been recognized in California that a six-pack photo array is impermissibly suggestive where the defendant's photograph "stand[s] out" from the others.  (*People v. Carlos*, *supra*, 138 Cal.App.4th at p. 912.)

5

Here, the Fullerton detective constructed eight six-pack photographic lineups and showed them to the three eyewitnesses:  Holguin, Patlan, and Gomez.  While there is no indication that he acted with improper motives, the detective, in varying degrees, violated all of the modern basic principles noted above that exist to ensure the reliability of eyewitness identifications.  These systemic violations, which occurred from the outset of the detective's investigation, were so "impermissibly suggestive" that, when judged in the totality of the surrounding circumstances (as discussed in the probability analysis in the majority opinion), there was a "very substantial likelihood" of a tainted misidentification at trial and ultimately a violation of Miles' due process rights.

First, the detective violated the first basic principle of fair lineup construction by placing multiple suspects in multiple lineups.  The detective constructed eight six-pack photo arrays and labeled them A through H.  Lineup A consisted of only one suspect, Teamer, who was placed in position one and had been previously identified by Holguin, the only witness who had any interaction with him.  But for the remaining seven lineups, lineups B through H, the detective placed multiple suspects in four of the lineups in order to identify both Accomplice One (the skinny robber) and Accomplice Two (the chubby robber).  Significantly, this error was present in lineup H, the lineup that contained Miles' photograph in addition to that of one other suspect.  Further, the suspect photos did not appear to be randomized.  That is, in seven of the eight six-pack lineups, a photograph of a suspect was placed in position one.

The Attorney General argues in her return that the detective included Miles as a "filler" in lineup H.  But at the initial habeas hearing the detective agreed that lineup H contained two suspects and four fillers.  The detective knew Miles was in the same gang as Teamer and placed his photo in lineup H along with another gang member.  The detective only later characterized Miles as "kind of like a filler photo" because the other gang member included in lineup H was more of a target in his mind.  But this admission

6

by the detective reveals the nature of the error that occurred: "fillers" are, by definition, nonsuspects. Again, by placing multiple suspects in multiple lineups the detective violated perhaps the most basic and fundamental tenet of fair lineup construction.

The detective also violated another principle of fair lineup construction: lineups must contain an adequate number of "fillers." This violation was part and parcel of the first violation (placing multiple suspects in multiple lineups). That is, if more than one suspect is placed in a six-pack lineup, the number of "filler" photos is necessarily reduced. For example, in lineup E the detective included photographs of four suspects, which necessarily reduced the number of fillers to two. Compounding that error, one of the suspects in lineup E was six feet, and one inch tall and 180 pounds, while another was five feet, eleven inches tall and 230 pounds. When asked about this, the detective explained that, "I was looking at two different suspects with two different descriptions." That is, while constructing the six-pack lineups, the detective combined photographs of those people matching the description for Accomplice One (the thinner robber) with those people matching the description for Accomplice Two (the chubbier robber). Thus, the detective improperly combined two separate lineup procedures into one, apparently for the sake of expediency.

This leads to the third, and most serious concern regarding the detective's construction of the lineups: the overriding principle that all the persons placed in a lineup should be similar in appearance. (*People v. Dampier* (1984) 159 Cal.App.3d 709, 712-713.) While it is not of course possible that the photographs be identical, each of them must represent a viable choice based on the descriptions of the witnesses and there should be nothing that causes the suspect to "'stand out'" in such a way that suggests that the witness should select him. (*People v. Carpenter* (1997) 15 Cal.4th 312, 367, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.) According to the unimpeached expert testimony at the habeas proceeding, research shows that if only one

7

person in a lineup matches the description given by the witnesses, then that person is the most likely to be selected.

Here, the description that the detective was working from for the purposes of assembling a six-pack photographic lineup for Accomplice Two was a black male, dark complexion, and stocky enough to cause a roll on the back of his neck. In lineup H, the six-pack lineup used to identify Miles, his photograph was placed in position one and is arguably the only photograph that appears to fit that description. That is, all six of the photographs were, of course, of black males. But three of the men in the photographs do not appear to have particularly dark complexions. And more importantly, five of the men do not appear to be stocky enough to cause a roll on the back of their necks. This lone photograph, depicting a black male with dark complexion and stocky enough to cause a roll on the back of his neck, logically caused Miles to "stand out" from the others in the lineup.

Indeed, at least four of the persons in lineup H (the photographs placed in positions two, three, four, and six) appear to more closely match the description of Accomplice One, the thinner robber. Therefore, the best that can be said is that lineup H contained only two possible photographs that may have fit the description of Accomplice Two: Miles and one filler. Effectively, the identification of Miles as Accomplice Two came down to at most to a 50/50 proposition. Indeed, when the witness from the auto parts store, Holguin, was asked to look at lineup H, he went back and forth between Miles in position one and the only other viable person that could possibly match the description of Accomplice Two, the person in position five.

The combined effects of the detective's lineup construction violations mentioned above rendered all three of the pretrial photo identifications "unduly suggestive." Moreover, in addition to the flawed construction of the lineups, the

8

detective compromised another "system variable" with respect to Patlan:  the pre-identification instructions.

California does not have a per se rule requiring pre-identification instructions.  (*People v. Lucas* (2014) 60 Cal.4th 153, 237, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)  But there appears to be a broad consensus that witnesses should be admonished before an identification procedure.  "Identification procedures should begin with instructions to the witness that the suspect may or may not be in the lineup or array and that the witness should not feel compelled to make an identification." (*Henderson*, *supra*, 208 N.J. at p. 250.)  The reason for this pre-identification admonition is to work against a possible assumption by the witness that the suspect is present in the lineup and the witnesses' only task is to choose the correct one.  Further, investigating officers are advised to minimize anything in advance of the lineup that may contaminate the identification process:  "To maintain the reliability of eyewitness identification, you must avoid any conduct prior to the identification that might be ruled suggestive.  Never tell the witness:  [¶]  you caught (or think you caught) the person who committed the crime."  (California District Attorney's Association, California Peace Officers Legal Sourcebook (Rev. Sept. 2014) pp. 8.1-8.2.)

Here, about a month after the robbery and before showing Patlan lineup H, the detective notified him in advance that he had apprehended two suspects, apparently to assuage his fears.  And although Patlan signed the standard written admonishment advising him that the robbers may or may not be present in the lineup, this admonition was effectively negated because Patlan already knew in advance that both of the robbers had apparently been apprehended.

Finally, there was one other area of potential concern regarding the pretrial identification procedures in this case:  the lack of double-blind or blind administration.  Again, it appears to be self-evident that this type of administration enhances the

reliability of eyewitness identifications. "An identification may be unreliable if the lineup procedure is not administered in double-blind or blind fashion. Double-blind administrators do not know who the actual suspect is. Blind administrators are aware of that information but shield themselves from knowing where the suspect is located in the lineup or photo array." (*Henderson*, *supra*, 208 N.J. at p. 248.)

If the administrator of the lineup is familiar with the suspect, then that information can be communicated to the witnesses either "consciously or subconsciously." (*Henderson*, *supra*, 208 N.J. at pp. 248-249.) "The consequences are clear: a non-blind lineup procedure can affect the reliability of a lineup because even the best-intentioned, non-blind administrator can act in a way that inadvertently sways an eyewitness trying to identify a suspect. An ideal lineup administrator, therefore, is someone who is not investigating the particular case and does not know who the suspect is." (*Id*. at p. 249.) However, the California Supreme Court has refused to adopt a per se rule requiring police to conduct photographic lineups in a blind or double-blind fashion. (*People v. Lucas*, *supra*, 60 Cal.4th at p. 237.)

Here, the same Fullerton detective investigated the robbery, identified possible suspects, and then constructed the six-pack lineups, which included the photographs of the possible suspects he had identified. The same detective then administered those lineups to the witnesses. Thus, the danger of unintentional witness contamination was clearly present. In sum, the pretrial identification lineups and procedures involving Patlan, Gomez, and Holguin were unduly suggestive.

*Gomez's In-Court Identification of Miles Was Also Unduly Suggestive*

Another basic principle of reliable eyewitness identifications is that there should be an effort to avoid giving feedback to witnesses. "Information received by witnesses both before and after an identification can affect their memory." (*Henderson*,

10

*supra*, 208 N.J. at p. 253.) Confirmatory feedback occurs when it is signaled "to eyewitnesses that they correctly identified the suspect. That confirmation can reduce doubt and engender a false sense of confidence in a witness. Feedback can also falsely enhance a witness' recollection of the quality of his or her view of an event." (*Ibid.*)

There is also a danger of a "carryover effect" in eyewitness identifications. This essentially means that viewing a photograph once in a picture can affect all future identifications. "Viewing a suspect more than once during an investigation can affect the reliability of the later identification. The problem, as the Special Master found, is that successive views of the same person can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure." (*Henderson*, *supra*, 208 N.J. at p. 255.)

Here, Gomez unequivocally identified Miles as Accomplice Two at trial in front of the jury. But the events that occurred outside of the presence of the jury just prior to Gomez's identification contaminated the reliability of that in-court identification.

During a morning break, when the judge and the jury were not present, the prosecutor asked Gomez if she could identify Miles as Accomplice Two. Gomez repeatedly told the prosecutor that she was unable to do so, even after Gomez had walked up to Miles at counsel table and studied him closely and carefully. The jury heard about this encounter after the fact because Miles's counsel was present, took notes, and thoroughly cross-examined and argued the point. But had this event transpired in front of the jury, there can only be speculation as to what effect that may have had. Indeed, it is not unheard of for witnesses to be unable to identify defendants in court. Trials often occur months or years after the events that precipitated them; criminal defendants are often dressed differently in court. Generally, prosecutors usually address these anomalies forthrightly and explain the possible reasons for in-court misidentifications during closing argument.

11

But what the prosecutor did in this case was troubling, to say the least. Gomez related that during the period of her uncertainty, the prosecutor showed her a color photocopy of Miles' booking photo outside of the presence of the jury. In fact, according to Miles' counsel, this occurred in the hallway outside of the courtroom while another witness from the loan office was present. The booking photo is clear: it shows that Miles had been arrested by the Fullerton Police Department on August 5, 1998. It was only after looking at the booking photo that Gomez said, "I looked at the picture she showed me, and then I was certain that that is [Accomplice Two] in the robbery."

There are many troubling aspects to this ad hoc photo identification procedure. In the first place, it had none of the reliability protections that come with a properly executed six-pack photographic lineup utilizing one suspect and five fillers as discussed earlier. The prosecutor essentially conducted a photographic lineup with only one photograph. There was also presumably no formal admonition. Further, the prosecutor's showing of the booking photo to Gomez during the period of her uncertainty gave Gomez precisely the type of positive feedback that experts in the field feel should be avoided. That is, the booking photo undoubtedly signaled to Gomez that she had correctly identified Miles as Accomplice Two; she could plainly see from the booking photo that Miles was, in fact, the person that had been arrested near the time of the robbery. Moreover, the entire episode appears to have reduced or eliminated any doubt that she may have had. This undoubtedly engendered a false sense of confidence, and Gomez's confidence in her identification was undoubtedly communicated to the jury.

Additionally, there is also a concern about the possible "carryover effect" of Gomez's multiple photo identifications. That is, it is impossible to know whether Gomez's in-court identification of Miles stemmed from her actual memory of seeing him at the robbery or whether it stemmed from her memory of seeing Miles' photograph in

12

the earlier six-pack lineup as well as the booking photo, which the prosecutor showed to Gomez just prior to her testimony.

*The False Eyewitness Evidence Was Material*

A recent California Supreme Court case has been helpful to analyzing the legal standard for determining the materiality of false evidence. (*Richards*, *supra*, 63 Cal.4th 291.) In *Richards*, a jury convicted defendant of his wife's murder. At trial, the prosecution introduced the testimony of a dental expert who testified that a bite mark on the wife's hand was consistent with the defendant's "unusual teeth." (*Id.* at pp. 293, 300-302.) In forming his opinion, the expert relied on an autopsy photograph of a "crescent-shaped lesion" on the victim's hand. (*Id*. at pp. 300-302.) Ten years after defendant's conviction, the dental expert repudiated his own opinion in a habeas corpus proceeding. The California Supreme Court ultimately found that the defendant had established that the dental expert's trial testimony constituted "'false evidence'" under a recently amended portion of section 1473, subdivision (c),[1] which changed the definition of false evidence as it relates to expert testimony. (*Id.* at p. 311.)

In *Richards*, once the Supreme Court had determined that "false evidence" had been presented to the jury, it then focused on the materiality determination, and

---

[1] "For purposes of this section, 'false evidence' includes opinions of experts that have either been repudiated by the expert who originally provided the opinion at a hearing or trial or that have been undermined by later scientific research or technological advances." (§ 1473, subd. (e)(1).) Miles argued in a letter brief that the opinion of the Peoples' eyewitness expert witness, Dr. Ebbe Ebbsen, who was called in rebuttal at Miles' 1998 trial has been "undermined by later scientific research" since that time. Dr. Ebbsen had largely criticized the methodology of the research relied upon by the defense's eyewitness expert who had been called at trial, Dr. Scott Fraser. This particular "false evidence" claim has not been factored into the analysis because no evidentiary hearings have been conducted regarding that issue.

13

ultimately found the false expert testimony material and granted habeas relief. (*Richards*, *supra*, 63 Cal.4th at pp. 312-315.) "The statute and the prior decisions applying section 1473 make clear that once a defendant shows that false evidence was admitted at trial, relief is available under [section] 1473 as long as the false evidence was 'material.' Our case law further explains that false evidence is material "'if there is a 'reasonable probability' that, had it not been introduced, the result would have been different.'" [Citation.] The remedial purpose of the statute is to afford the petitioner relief if the 'false evidence [was] of such significance that it *may have* affected the outcome of the trial . . . .' [Citation.] Thus, the crucial question is whether the false evidence was material—not whether, without the false evidence, there was still substantial evidence to support the verdict." (*Richards*, at p. 312, italics added.) The "materiality" determination is the same prejudice standard appellate courts routinely employ: "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

It is not necessary at this point to fully review the entirety of the evidence. In short, the prosecution relied on the eyewitness testimony of Patlan and Gomez who identified Miles as Accomplice Two at the scene of the Fidelity office in Fullerton on June 29, 1998. Without that testimony, which can now fairly be characterized as "false" within the meaning of the habeas corpus statute, there is a reasonable probability that the jury would <u>not</u> have convicted Miles. Thus, in my opinion, the false identification evidence was "material" and therefore would have been dispositive for the purposes of granting Miles habeas corpus relief.

MOORE, ACTING P. J.

14